# ARIZONA *v.* MARICOPA COUNTY MEDICAL SOCIETY ET AL.

No. 80–419.   Argued November 4, 1981—Decided June 18, 1982

STEVENS, J., delivered the opinion of the Court, in which BRENNAN, WHITE, and MARSHALL, JJ., joined. POWELL, J., filed a dissenting opinion, in which BURGER, C. J., and REHNQUIST, J., joined, *post*, p. 357. BLACKMUN and O'CONNOR, JJ., took no part in the consideration or decision of the case.

*Kenneth R. Reed*, Special Assistant Attorney General of Arizona, argued the cause for petitioner. With him on the briefs were *Robert K. Corbin*, Attorney General, *Charles L. Eger*, Assistant Attorney General, *Alison B. Swan*, and *Patricia A. Metzger*.

*Philip P. Berelson* argued the cause for respondents. With him on the brief were *Robert O. Lesher* and *Daniel J. McAuliffe.*

*Deputy Solicitor General Shapiro* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General McCree, Assistant Attorney General Baxter, Deputy Solicitor General Wallace, Barry Grossman, Robert B. Nicholson,* and *Nancy C. Garrison.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of Alabama et al. by *Charles A. Graddick,* Attorney General of Alabama, and *Susan Beth Farmer, Sarah M. Spratling,* and *James Drury Flowers,* Assistant Attorneys General; *Wilson L. Condon,* Attorney General of Alaska, and *Louise E. Ma,* Assistant Attorney General; *Steve Clark,* Attorney General of Arkansas, and *David L. Williams,* Deputy Attorney General; *J. D. MacFarlane,* Attorney General of Colorado, and *B. Lawrence Theis,* First Assistant Attorney General; *Carl R. Ajello,* Attorney General of Connecticut, and *Robert M. Langer, John R. Lacey, John M. Looney, Jr.,* and *Steven M. Rutstein,* Assistant Attorneys General; *Richard S. Gebelein,* Attorney General of Delaware, and *Robert P. Lobue,* Deputy Attorney General; *Jim Smith,* Attorney General of Florida, and *Bill L. Bryant, Jr.,* Assistant Attorney General; *Tany S. Hong,* Attorney General of Hawaii, and *Sonia Faust,* Deputy Attorney General; *Tyrone C. Fahner,* Attorney General of Illinois, and *Thomas M. Genovese,* Assistant Attorney General; *Linley E. Pearson,* Attorney General of Indiana, and *Frank A. Baldwin,* Assistant Attorney General; *Thomas J. Miller,* Attorney General of Iowa, and *John R. Perkins,* Assistant Attorney General; *Robert T. Stephan,* Attorney General of Kansas, and *Carl M. Anderson,* Assistant Attorney General; *Steven L. Beshear,* Attorney General of Kentucky, and *James M. Ringo,* Assistant Attorney General; *William J. Guste, Jr.,* Attorney General of Louisiana, and *John R. Flowers, Jr.,* Assistant Attorney General; *James E. Tierney,* Attorney General of Maine; *Stephen H. Sachs,* Attorney General of Maryland, and *Charles O. Monk II,* Assistant Attorney General; *Frank J. Kelley,* Attorney General of Michigan, and *Edwin M. Bladen,* Assistant Attorney General; *Warren R. Spannaus,* Attorney General of Minnesota, and *Stephen P. Kilgriff,* Special Assistant Attorney General; *Bill Allain,* Attorney General of Mississippi, and *Robert E. Sand-*

JUSTICE STEVENS delivered the opinion of the Court.

The question presented is whether § 1 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 1, has been violated by agreements among competing physicians setting, by majority vote, the maximum fees that they may claim in full

ers, Special Assistant Attorney General; *John Ashcroft*, Attorney General of Missouri, and *William L. Newcomb, Jr.*, Assistant Attorney General; *Michael T. Greely*, Attorney General of Montana, and *Jerome J. Cate*, Assistant Attorney General; *Paul L. Douglas*, Attorney General of Nebraska, and *Dale A. Comer*, Assistant Attorney General; *Gregory H. Smith*, Attorney General of New Hampshire; *James R. Zazzali*, Attorney General of New Jersey, and *Laurel A. Price*, Deputy Attorney General; *Jeff Bingaman*, Attorney General of New Mexico, and *James J. Wechsler* and *Richard H. Levin*, Assistant Attorneys General; *Robert Abrams*, Attorney General of New York, and *Lloyd Constantine*, Assistant Attorney General; *Rufus L. Edmisten*, Attorney General of North Carolina, *H. A. Cole, Jr.*, Special Deputy Attorney General, and *R. Darrell Hancock*, Associate Attorney General; *Robert O. Wefald*, Attorney General of North Dakota, and *Gary H. Lee*, Assistant Attorney General; *Jan Eric Cartwright*, Attorney General of Oklahoma, and *Gary W. Gardenshire*, Assistant Attorney General; *Dennis J. Roberts II*, Attorney General of Rhode Island, and *Patrick J. Quinlan*, Special Assistant Attorney General; *Daniel R. McLeod*, Attorney General of South Carolina, and *John M. Cox*, Assistant Attorney General; *Mark V. Meierhenry*, Attorney General of South Dakota, and *James E. McMahon*, Assistant Attorney General; *William M. Leech, Jr.*, Attorney General of Tennessee, and *William J. Haynes*, Deputy Attorney General; *Mark White*, Attorney General of Texas, and *Linda A. Aaker*, Assistant Attorney General; *David L. Wilkinson*, Attorney General of Utah, and *Peter C. Collins*, Assistant Attorney General; *John J. Easton, Jr.*, Attorney General of Vermont, and *Jay I. Ashman*, Assistant Attorney General; *Kenneth O. Eikenberry*, Attorney General of Washington, and *John R. Ellis*, Assistant Attorney General; *Chauncey H. Browning*, Attorney General of West Virginia, and *Charles G. Brown*, Deputy Attorney General; *Bronson C. La Follette*, Attorney General of Wisconsin, and *Michael L. Zaleski*, Assistant Attorney General; and *John D. Troughton*, Attorney General of Wyoming, and *Gay R. Venderpoel*, Assistant Attorney General; for the State of Ohio by *William J. Brown*, Attorney General, and *Charles D. Weller, Doreen C. Johnson*, and *Eugene F. McShane*, Assistant Attorneys General; for Chalmette General Hospi-

payment for health services provided to policyholders of specified insurance plans. The United States Court of Appeals for the Ninth Circuit held that the question could not be answered without evaluating the actual purpose and effect of the agreements at a full trial. 643 F. 2d 553 (1980). Because the undisputed facts disclose a violation of the statute, we granted certiorari, 450 U. S. 979 (1981), and now reverse.

## I

In October 1978 the State of Arizona filed a civil complaint against two county medical societies and two "foundations for medical care" that the medical societies had organized. The complaint alleged that the defendants were engaged in illegal price-fixing conspiracies.[1] After the defendants filed their answers, one of the medical societies was dismissed by consent, the parties conducted a limited amount of pretrial discovery, and the State moved for partial summary judgment on the issue of liability. The District Court denied the motion,[2] but entered an order pursuant to 28 U. S. C. § 1292(b),

---

tal, Inc., et al. by *John A. Stassi II;* and for Hospital Building Co. by *John K. Train III* and *John R. Jordan, Jr.*

Briefs of *amici curiae* urging affirmance were filed by *William G. Kopit* and *Robert J. Moses* for the American Association of Foundations for Medical Care; by *Richard L. Epstein* and *Jay H. Hedgepeth* for the American Hospital Association; and by *M. Laurence Popofsky* and *Peter F. Sloss* for California Dental Service.

*Alfred Miller* filed a brief for the American Association of Retired Persons et al. as *amici curiae.*

[1] The complaint alleged a violation of § 1 of the Sherman Act as well as of the Arizona antitrust statute. The state statute is interpreted in conformity with the federal statute. 643 F. 2d 533, 554, n. 1 (CA9 1980). The State of Arizona prayed for an injunction but did not ask for damages.

[2] The District Court offered three reasons for its decision. First, citing *Continental T. V., Inc.* v. *GTE Sylvania Inc.,* 433 U. S. 36 (1977), the court stated that "a recent antitrust trend appears to be emerging where the Rule of Reason is the preferred method of determining whether a particular practice is in violation of the antitrust law." App. to Pet. for Cert. 43. Second, "the two Supreme Court cases invalidating maximum price-

certifying for interlocutory appeal the question "whether the FMC membership agreements, which contain the promise to abide by maximum fee schedules, are illegal per se under section 1 of the Sherman Act."[3]

The Court of Appeals, by a divided vote, affirmed the District Court's order refusing to enter partial summary judgment, but each of the three judges on the panel had a different view of the case.  Judge Sneed was persuaded that "the challenged practice is not a per se violation."  643 F. 2d, at

fixing, [*Kiefer-Stewart Co.* v. *Joseph E. Seagram & Sons, Inc.,* 340 U. S. 211 (1951), and *Albrecht* v. *Herald Co.,* 390 U. S. 145 (1968)], need not be read as establishing a per se rule." *Id.,* at 44.  Third, "a profession is involved here." *Id.,* at 45.  Under the rule-of-reason approach, the plaintiff's motion for partial summary judgment on the issue of liability could not be granted "because there is insufficient evidence as to the [purpose and effect of the allegedly unlawful practices and the power of the defendants.]" *Id.,* at 47.

The District Court also denied the defendants' motion to dismiss based on the ground that they were engaged in the business of insurance within the meaning of the McCarran-Ferguson Act, 15 U. S. C. § 1011 *et seq.* See App. to Pet. for Cert. 39–41.  The defendants did not appeal that portion of the District Court order.  643 F. 2d, at 559, and n. 7.

[3] The quoted language is the Court of Appeals' phrasing of the question. *Id.,* at 554.  The District Court had entered an order on June 5, 1979, providing, in relevant part:

"The plaintiff's motion for partial summary judgment on the issue of liability is denied with leave to file a similar motion based on additional evidence if appropriate." App. to Pet. for Cert. 48.

On August 8, 1979, the District Court entered a further order providing:

"The Order of this Court entered June 5, 1979 is amended by addition of the following: This Court's determination that the Rule of Reason approach should be used in analyzing the challenged conduct in the instant case to determine whether a violation of Section 1 of the Sherman Act has occurred involves a question of law as to which there is substantial ground for difference of opinion and an immediate appeal from the Order denying plaintiff's motion for partial summary judgment on the issue of liability may materially advance the ultimate determination of the litigation. Therefore, the foregoing Order and determination of the Court is certified for interlocutory appeal pursuant to 28 U. S. C. § 1292(b)." *Id.,* at 50–51.

560.[4] Judge Kennedy, although concurring, cautioned that he had not found "these reimbursement schedules to be per se proper, [or] that an examination of these practices under the rule of reason at trial will not reveal the proscribed adverse effect on competition, or that this court is foreclosed at some later date, when it has more evidence, from concluding that such schedules do constitute per se violations." *Ibid.*[5] Judge Larson dissented, expressing the view that a *per se* rule should apply and, alternatively, that a rule-of-reason analysis should condemn the arrangement even if a *per se* approach was not warranted. *Id.*, at 563–569.[6]

---

[4] Judge Sneed explained his reluctance to apply the *per se* rule substantially as follows: The record did not indicate the actual purpose of the maximum-fee arrangements or their effect on competition in the health care industry. It was not clear whether the assumptions made about typical price restraints could be carried over to that industry. Only recently had this Court applied the antitrust laws to the professions. Moreover, there already were such significant obstacles to pure competition in the industry that a court must compare the prices that obtain under the maximum-fee arrangements with those that would otherwise prevail rather than with those that would prevail under ideal competitive conditions. Furthermore, the Ninth Circuit had not applied *Keifer-Stewart Co.* v. *Joseph E. Seagram & Sons, Inc.*, 340 U. S. 211 (1951), and *Albrecht* v. *Herald Co.*, 390 U. S. 145 (1968), to horizontal agreements that establish maximum prices; some of the economic assumptions underlying the rule against maximum price fixing were not sound.

[5] Judge Kennedy's concurring opinion concluded as follows:

"There does not now appear to be a controlling or definitive analysis of the market impact caused by the arrangements under scrutiny in this case, but trial may reveal that the arrangements are, at least in their essentials, not peculiar to the medical industry and that they should be condemned." 643 F. 2d, at 560.

[6] Judge Larson stated, in part:

"Defendants formulated and dispersed relative value guides and conversion factor lists which together were used to set an upper limit on fees received from third-party payors. It is clear that these activities constituted maximum price-fixing by competitors. Disregarding any 'special industry' facts, this conduct is per se illegal. Precedent alone would mandate application of the per se standard.

"I find nothing in the nature of either the medical profession or the

Because the ultimate question presented by the certiorari petition is whether a partial summary judgment should have been entered by the District Court, we must assume that the respondents' version of any disputed issue of fact is correct. We therefore first review the relevant undisputed facts and then identify the factual basis for the respondents' contention that their agreements on fee schedules are not unlawful.

## II

The Maricopa Foundation for Medical Care is a nonprofit Arizona corporation composed of licensed doctors of medicine, osteopathy, and podiatry engaged in private practice. Approximately 1,750 doctors, representing about 70% of the practitioners in Maricopa County, are members.

The Maricopa Foundation was organized in 1969 for the purpose of promoting fee-for-service medicine and to provide the community with a competitive alternative to existing health insurance plans.[7] The foundation performs three primary activities. It establishes the schedule of maximum fees that participating doctors agree to accept as payment in full for services performed for patients insured under plans approved by the foundation. It reviews the medical necessity and appropriateness of treatment provided by its members to such insured persons. It is authorized to draw checks on insurance company accounts to pay doctors for

---

health care industry that would warrant their exemption from per se rules for price-fixing." *Id.*, at 563–564 (citations omitted).

[7] Most health insurance plans are of the fee-for-service type. Under the typical insurance plan, the insurer agrees with the insured to reimburse the insured for "usual, customary, and reasonable" medical charges. The third-party insurer, and the insured to the extent of any excess charges, bears the economic risk that the insured will require medical treatment. An alternative to the fee-for-service type of insurance plan is illustrated by the health maintenance organizations authorized under the Health Maintenance Organization Act of 1973, 42 U. S. C. § 300e *et seq.* Under this form of prepaid health plan, the consumer pays a fixed periodic fee to a functionally integrated group of doctors in exchange for the group's agreement to provide any medical treatment that the subscriber might need. The economic risk is thus borne by the doctors.

services performed for covered patients. In performing these functions, the foundation is considered an "insurance administrator" by the Director of the Arizona Department of Insurance. Its participating doctors, however, have no financial interest in the operation of the foundation.

The Pima Foundation for Medical Care, which includes about 400 member doctors,[8] performs similar functions. For the purposes of this litigation, the parties seem to regard the activities of the two foundations as essentially the same. No challenge is made to their peer review or claim administration functions. Nor do the foundations allege that these two activities make it necessary for them to engage in the practice of establishing maximum-fee schedules.

At the time this lawsuit was filed,[9] each foundation made use of "relative values" and "conversion factors" in compiling its fee schedule. The conversion factor is the dollar amount used to determine fees for a particular medical specialty. Thus, for example, the conversion factors for "medicine" and "laboratory" were $8 and $5.50, respectively, in 1972, and $10 and $6.50 in 1974. The relative value schedule provides a numerical weight for each different medical service—thus, an office consultation has a lesser value than a home visit. The relative value was multiplied by the conversion factor to determine the maximum fee. The fee schedule has been revised periodically. The foundation board of trustees would solicit advice from various medical societies about the need

---

[8] The record contains divergent figures on the percentage of Pima County doctors that belong to the foundation. A 1975 publication of the foundation reported 80%; a 1978 affidavit by the executive director of the foundation reported 30%.

[9] In 1980, after the District Court and the Court of Appeals had rendered judgment, both foundations apparently discontinued the use of relative values and conversion factors in formulating the fee schedules. Moreover, the Maricopa Foundation that year amended its bylaws to provide that the fee schedule would be adopted by majority vote of its board of trustees and not by vote of its members. The challenge to the foundation activities as we have described them in the text, however, is not mooted by these changes. See *United States* v. *W. T. Grant Co.*, 345 U. S. 629 (1953).

for change in either relative values or conversion factors in their respective specialties. The board would then formulate the new fee schedule and submit it to the vote of the entire membership.[10]

The fee schedules limit the amount that the member doctors may recover for services performed for patients insured under plans approved by the foundations. To obtain this approval the insurers—including self-insured employers as well as insurance companies[11]—agree to pay the doctors' charges up to the scheduled amounts, and in exchange the doctors agree to accept those amounts as payment in full for their services. The doctors are free to charge higher fees to uninsured patients, and they also may charge any patient less than the scheduled maxima. A patient who is insured by a foundation-endorsed plan is guaranteed complete coverage for the full amount of his medical bills only if he is treated by a foundation member. He is free to go to a nonmember physician and is still covered for charges that do not exceed the maximum-fee schedule, but he must pay any excess that the nonmember physician may charge.

The impact of the foundation fee schedules on medical fees and on insurance premiums is a matter of dispute. The State of Arizona contends that the periodic upward revisions of the maximum-fee schedules have the effect of stabilizing and enhancing the level of actual charges by physicians, and

[10] The parties disagree over whether the increases in the fee schedules are the cause or the result of the increases in the prevailing rate for medical services in the relevant markets. There appears to be agreement, however, that 85–95% of physicians in Maricopa County bill at or above the maximum reimbursement levels set by the Maricopa Foundation.

[11] Seven different insurance companies underwrite health insurance plans that have been approved by the Maricopa Foundation, and three companies underwrite the plans approved by the Pima Foundation. The record contains no firm data on the portion of the health care market that is covered by these plans. The State relies upon a 1974 analysis indicating that the insurance plans endorsed by the Maricopa Foundation had about 63% of the prepaid health care market, but the respondents contest the accuracy of this analysis.

that the increasing level of their fees in turn increases insurance premiums. The foundations, on the other hand, argue that the schedules impose a meaningful limit on physicians' charges, and that the advance agreement by the doctors to accept the maxima enables the insurance carriers to limit and to calculate more efficiently the risks they underwrite and therefore serves as an effective cost-containment mechanism that has saved patients and insurers millions of dollars. Although the Attorneys General of 40 different States, as well as the Solicitor General of the United States and certain organizations representing consumers of medical services, have filed *amicus curiae* briefs supporting the State of Arizona's position on the merits, we must assume that the respondents' view of the genuine issues of fact is correct.

This assumption presents, but does not answer, the question whether the Sherman Act prohibits the competing doctors from adopting, revising, and agreeing to use a maximum-fee schedule in implementation of the insurance plans.

## III

The respondents recognize that our decisions establish that price-fixing agreements are unlawful on their face. But they argue that the *per se* rule does not govern this case because the agreements at issue are horizontal and fix maximum prices, are among members of a profession, are in an industry with which the judiciary has little antitrust experience, and are alleged to have procompetitive justifications. Before we examine each of these arguments, we pause to consider the history and the meaning of the *per se* rule against price-fixing agreements.

### A

Section 1 of the Sherman Act of 1890 literally prohibits *every* agreement "in restraint of trade."[12] In *United States*

---

[12] "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . ." 15 U. S. C. § 1.

v. *Joint Traffic Assn.*, 171 U. S. 505 (1898), we recognized that Congress could not have intended a literal interpretation of the word "every"; since *Standard Oil Co. of New Jersey* v. *United States*, 221 U. S. 1 (1911), we have analyzed most restraints under the so-called "rule of reason." As its name suggests, the rule of reason requires the factfinder to decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition.[13]

The elaborate inquiry into the reasonableness of a challenged business practice entails significant costs. Litigation of the effect or purpose of a practice often is extensive and complex. *Northern Pacific R. Co.* v. *United States*, 356 U. S. 1, 5 (1958). Judges often lack the expert understanding of industrial market structures and behavior to determine with any confidence a practice's effect on competition. *United States* v. *Topco Associates, Inc.*, 405 U. S. 596, 609–610 (1972). And the result of the process in any given case may provide little certainty or guidance about the legality of a practice in another context. *Id.*, at 609, n. 10; *Northern Pacific R. Co.* v. *United States, supra*, at 5.

The costs of judging business practices under the rule of reason, however, have been reduced by the recognition of *per*

---

[13] Justice Brandeis provided the classic statement of the rule of reason in *Chicago Bd. of Trade* v. *United States*, 246 U. S. 231, 238 (1918):

"The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences."

*se* rules.[14]  Once experience with a particular kind of re-
straint enables the Court to predict with confidence that the
rule of reason will condemn it, it has applied a conclusive pre-
sumption that the restraint is unreasonable.[15]  As in every
rule of general application, the match between the presumed
and the actual is imperfect.  For the sake of business cer-
tainty and litigation efficiency, we have tolerated the invali-
dation of some agreements that a fullblown inquiry might
have proved to be reasonable.[16]

Thus the Court in *Standard Oil* recognized that inquiry
under its rule of reason ended once a price-fixing agreement
was proved, for there was "a conclusive presumption which

---

[14] For a thoughtful and brief discussion of the costs and benefits of rule-
of-reason versus *per se* rule analysis of price-fixing agreements, see
F. Scherer, Industrial Market Structure and Economic Performance
438–443 (1970).  Professor Scherer's "opinion, shared by a majority of
American economists concerned with antitrust policy, is that in the present
legal framework the costs of implementing a rule of reason would exceed
the benefits derived from considering each restrictive agreement on its
merits and prohibiting only those which appear unreasonable."  *Id.*, at
440.

[15] "Among the practices which the courts have heretofore deemed to be
unlawful in and of themselves are price fixing, division of markets, group
boycotts, and tying arrangements."  *Northern Pacific R. Co.* v. *United
States*, 356 U. S., at 5 (citations omitted).  See *United States* v. *Columbia
Steel Co.*, 334 U. S. 495, 522–523 (1948).

[16] Thus, in applying the *per se* rule to invalidate the restrictive practice in
*United States* v. *Topco Associates, Inc.*, 405 U. S. 596 (1972), we stated
that "[w]hether or not we would decide this case the same way under the
rule of reason used by the District Court is irrelevant to the issue before
us."  *Id.*, at 609.  The Court made the same point in *Continental T. V.,
Inc.* v. *GTE Sylvania Inc.*, 433 U. S., at 50, n. 16:

"*Per se* rules thus require the Court to make broad generalizations about
the social utility of particular commercial practices.  The probability that
anticompetitive consequences will result from a practice and the severity of
those consequences must be balanced against its procompetitive conse-
quences.  Cases that do not fit the generalization may arise, but a *per se*
rule reflects the judgment that such cases are not sufficiently common or
important to justify the time and expense necessary to identify them."

brought [such agreements] within the statute." 221 U. S., at 65. By 1927, the Court was able to state that "it has . . . often been decided and always assumed that uniform price-fixing by those controlling in any substantial manner a trade or business in interstate commerce is prohibited by the Sherman Law." *United States* v. *Trenton Potteries Co.*, 273 U. S. 392, 398.

> "The aim and result of every price-fixing agreement, if effective, is the elimination of one form of competition. The power to fix prices, whether reasonably exercised or not, involves power to control the market and to fix arbitrary and unreasonable prices. The reasonable price fixed today may through economic and business changes become the unreasonable price of tomorrow. Once established, it may be maintained unchanged because of the absence of competition secured by the agreement for a price reasonable when fixed. Agreements which create such potential power may well be held to be in themselves unreasonable or unlawful restraints, without the necessity of minute inquiry whether a particular price is reasonable or unreasonable as fixed and without placing on the government in enforcing the Sherman Law the burden of ascertaining from day to day whether it has become unreasonable through the mere variation of economic conditions." *Id.*, at 397–398.

Thirteen years later, the Court could report that "for over forty years this Court has consistently and without deviation adhered to the principle that price-fixing agreements are unlawful *per se* under the Sherman Act and that no showing of so-called competitive abuses or evils which those agreements were designed to eliminate or alleviate may be interposed as a defense." *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150, 218 (1940). In that case a glut in the spot market for gasoline had prompted the major oil refiners to engage in a concerted effort to purchase and store surplus gasoline in order to maintain stable prices. Absent the agreement, the

companies argued, competition was cutthroat and self-defeating. The argument did not carry the day:

> "Any combination which tampers with price structures is engaged in an unlawful activity. Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces. The Act places all such schemes beyond the pale and protects that vital part of our economy against any degree of interference. Congress has not left with us the determination of whether or not particular price-fixing schemes are wise or unwise, healthy or destructive. It has not permitted the age-old cry of ruinous competition and competitive evils to be a defense to price-fixing conspiracies. It has no more allowed genuine or fancied competitive abuses as a legal justification for such schemes than it has the good intentions of the members of the combination. If such a shift is to be made, it must be done by the Congress. Certainly Congress has not left us with any such choice. Nor has the Act created or authorized the creation of any special exception in favor of the oil industry. Whatever may be its peculiar problems and characteristics, the Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike." *Id.*, at 221–222.

The application of the *per se* rule to maximum-price-fixing agreements in *Kiefer-Stewart Co.* v. *Joseph E. Seagram & Sons, Inc.*, 340 U. S. 211 (1951), followed ineluctably from *Socony-Vacuum:*

> "For such agreements, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment. We reaffirm what we said in *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150, 223: 'Under

the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se.*'" 340 U. S., at 213.

Over the objection that maximum-price-fixing agreements were not the "economic equivalent" of minimum-price-fixing agreements,[17] *Kiefer-Stewart* was reaffirmed in *Albrecht* v. *Herald Co.*, 390 U. S. 145 (1968):

> "Maximum and minimum price fixing may have different consequences in many situations. But schemes to fix maximum prices, by substituting the perhaps erroneous judgment of a seller for the forces of the competitive market, may severely intrude upon the ability of buyers to compete and survive in that market. Competition, even in a single product, is not cast in a single mold. Maximum prices may be fixed too low for the dealer to furnish services essential to the value which goods have for the consumer or to furnish services and conveniences which consumers desire and for which they are willing to pay. Maximum price fixing may channel distribution through a few large or specifically advantaged dealers who otherwise would be subject to significant nonprice competition. Moreover, if the actual price charged under a maximum price scheme is nearly always the fixed maximum price, which is increasingly likely as the maximum price approaches the actual cost of the dealer, the scheme tends to acquire all the attributes of an arrangement fixing minimum prices." *Id.*, at 152–153 (footnote omitted).

We have not wavered in our enforcement of the *per se* rule against price fixing. Indeed, in our most recent price-fixing case we summarily reversed the decision of another Ninth

---

[17] *Albrecht* v. *Herald Co.*, 390 U. S., at 156 (Harlan, J., dissenting).

Circuit panel that a horizontal agreement among competitors to fix credit terms does not necessarily contravene the antitrust laws. *Catalano, Inc.* v. *Target Sales, Inc.*, 446 U. S. 643 (1980).

## B

Our decisions foreclose the argument that the agreements at issue escape *per se* condemnation because they are horizontal and fix maximum prices. *Kiefer-Stewart* and *Albrecht* place horizontal agreements to fix maximum prices on the same legal—even if not economic—footing as agreements to fix minimum or uniform prices.[18] The *per se* rule "is grounded on faith in price competition as a market force [and not] on a policy of low selling prices at the price of eliminating competition." Rahl, Price Competition and the Price Fixing Rule—Preface and Perspective, 57 Nw. U. L. Rev. 137, 142 (1962). In this case the rule is violated by a price restraint that tends to provide the same economic rewards to all practitioners regardless of their skill, their experience, their training, or their willingness to employ innovative and difficult procedures in individual cases. Such a restraint also may discourage entry into the market and may deter experimentation and new developments by individual entrepreneurs. It may be a masquerade for an agreement to fix uniform prices, or it may in the future take on that character.

Nor does the fact that doctors—rather than nonprofessionals—are the parties to the price-fixing agreements support the respondents' position. In *Goldfarb* v. *Virginia State Bar*, 421 U. S. 773, 788, n. 17 (1975), we stated that the "public service aspect, and other features of the professions, may

---

[18] It is true that in *Kiefer-Stewart*, as in *Albrecht*, the agreement involved a vertical arrangement in which maximum resale prices were fixed. But the case also involved an agreement among competitors to impose the resale price restraint. In any event, horizontal restraints are generally less defensible than vertical restraints. See *Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U. S. 36 (1977); Easterbrook, Maximum Price Fixing, 48 U. Chi. L. Rev. 886, 890, n. 20 (1981).

require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context, be treated differently." See *National Society of Professional Engineers* v. *United States*, 435 U. S. 679, 696 (1978). The price-fixing agreements in this case, however, are not premised on public service or ethical norms. The respondents do not argue, as did the defendants in *Goldfarb* and *Professional Engineers*, that the quality of the professional service that their members provide is enhanced by the price restraint. The respondents' claim for relief from the *per se* rule is simply that the doctors' agreement not to charge certain insureds more than a fixed price facilitates the successful marketing of an attractive insurance plan. But the claim that the price restraint will make it easier for customers to pay does not distinguish the medical profession from any other provider of goods or services.

We are equally unpersuaded by the argument that we should not apply the *per se* rule in this case because the judiciary has little antitrust experience in the health care industry.[19] The argument quite obviously is inconsistent with *Socony-Vacuum*. In unequivocal terms, we stated that, "[w]hatever may be its peculiar problems and characteristics, the Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike." 310 U. S., at 222. We also stated that "[t]he elimination of so-called competitive evils [in an industry] is no legal justification" for price-fixing agreements, *id.*, at 220, yet the Court of Appeals refused to apply the *per se* rule in

---

[19] The argument should not be confused with the established position that a *new per se* rule is not justified until the judiciary obtains considerable rule-of-reason experience with the particular type of restraint challenged. See *White Motor Co.* v. *United States*, 372 U. S. 253 (1963). Nor is our unwillingness to examine the economic justification of this particular application of the *per se* rule against price fixing inconsistent with our reexamination of the general validity of the *per se* rule rejected in *Continental T. V., Inc.* v. *GTE Sylvania Inc.*, *supra.*

this case in part because the health care industry was so far removed from the competitive model.[20]   Consistent with our prediction in *Socony-Vacuum*, 310 U. S., at 221, the result of this reasoning was the adoption by the Court of Appeals of a legal standard based on the reasonableness of the fixed prices,[21] an inquiry we have so often condemned.[22]   Finally,

[20] "The health care industry, moreover, presents a particularly difficult area.   The first step to understanding is to recognize that not only is access to the medical profession very time consuming and expensive both for the applicant and society generally, but also that numerous government subventions of the costs of medical care have created both a demand and supply function for medical services that is artificially high.   The present supply and demand functions of medical services in no way approximate those which would exist in a purely private competitive order.   An accurate description of those functions moreover is not available.   Thus, we lack baselines by which could be measured the distance between the present supply and demand functions and those which would exist under ideal competitive conditions."   643 F. 2d, at 556.

[21] "Perforce we must take industry as it exists, absent the challenged feature, as our baseline for measuring anticompetitive impact.   The relevant inquiry becomes whether fees paid to doctors under that system would be less than those payable under the FMC maximum fee agreement.   Put differently, confronted with an industry widely deviant from a reasonably free competitive model, such as agriculture, the proper inquiry is whether the practice enhances the prices charged for the services.   In simplified economic terms, the issue is whether the maximum fee arrangement better permits the attainment of the monopolist's goal, viz., the matching of marginal cost to marginal revenue, or in fact obstructs that end."   *Ibid.*

[22] In the first price-fixing case arising under the Sherman Act, the Court was required to pass on the sufficiency of the defendants' plea that they had established rates that were actually beneficial to consumers.   Assuming the factual validity of the plea, the Court rejected the defense as a matter of law.   *United States* v. *Trans-Missouri Freight Assn.*, 166 U. S. 290 (1897).   In *National Society of Professional Engineers* v. *United States*, 435 U. S. 679, 689 (1978), we referred to Judge Taft's "classic rejection of the argument that competitors may lawfully agree to sell their goods at the same price as long as the agreed-upon price is reasonable."   See *United States* v. *Addyston Pipe & Steel Co.*, 85 F. 271 (CA6 1898), aff'd, 175 U. S. 211 (1899).   In our latest price-fixing case, we reiterated the point: "It is no excuse that the prices fixed are themselves reasonable."   *Catalano, Inc.* v. *Target Sales, Inc.*, 446 U. S. 643, 647 (1980).

the argument that the *per se* rule must be rejustified for every industry that has not been subject to significant antitrust litigation ignores the rationale for *per se* rules, which in part is to avoid "the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken." *Northern Pacific R. Co.* v. *United States*, 356 U. S., at 5.

The respondents' principal argument is that the *per se* rule is inapplicable because their agreements are alleged to have procompetitive justifications. The argument indicates a misunderstanding of the *per se* concept. The anticompetitive potential inherent in all price-fixing agreements justifies their facial invalidation even if procompetitive justifications are offered for some.[23] Those claims of enhanced competition are so unlikely to prove significant in any particular case that we adhere to the rule of law that is justified in its general application. Even when the respondents are given every benefit of the doubt, the limited record in this case is not inconsistent with the presumption that the respondents' agreements will not significantly enhance competition.

The respondents contend that their fee schedules are procompetitive because they make it possible to provide consumers of health care with a uniquely desirable form of insurance coverage that could not otherwise exist. The features of the foundation-endorsed insurance plans that they stress are a choice of doctors, complete insurance coverage, and lower premiums. The first two characteristics, however, are hardly unique to these plans. Since only about 70% of

---

[23] "Whatever economic justification particular price-fixing agreements may be thought to have, the law does not permit an inquiry into their reasonableness. They are all banned because of their actual or potential threat to the central nervous system of the economy." *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150, 226, n. 59 (1940).

the doctors in the relevant market are members of either foundation, the guarantee of complete coverage only applies when an insured chooses a physician in that 70%. If he elects to go to a nonfoundation doctor, he may be required to pay a portion of the doctor's fee. It is fair to presume, however, that at least 70% of the doctors in other markets charge no more than the "usual, customary, and reasonable" fee that typical insurers are willing to reimburse in full.[24] Thus, in Maricopa and Pima Counties as well as in most parts of the country, if an insured asks his doctor if the insurance coverage is complete, presumably in about 70% of the cases the doctor will say "Yes" and in about 30% of the cases he will say "No."

It is true that a binding assurance of complete insurance coverage—as well as most of the respondents' potential for lower insurance premiums[25]—can be obtained only if the insurer and the doctor agree in advance on the maximum fee that the doctor will accept as full payment for a particular service. Even if a fee schedule is therefore desirable, it is not necessary that the doctors do the price fixing.[26] The

---

[24] According to the respondents' figures, this presumption is well founded. See Brief for Respondents 42, n. 120.

[25] We do not perceive the respondents' claim of procompetitive justification for their fee schedules to rest on the premise that the fee schedules actually reduce medical fees and accordingly reduce insurance premiums, thereby enhancing competition in the health insurance industry. Such an argument would merely restate the long-rejected position that fixed prices are reasonable if they are lower than free competition would yield. It is arguable, however, that the existence of a fee schedule, whether fixed by the doctors or by the insurers, makes it easier—and to that extent less expensive—for insurers to calculate the risks that they underwrite and to arrive at the appropriate reimbursement on insured claims.

[26] According to a Federal Trade Commission staff report: "Until the mid-1960's, most Blue Shield plans determined in advance how much to pay for particular procedures and prepared fee schedules reflecting their determinations. Fee schedules are still used in approximately 25 percent of Blue Shield contracts." Bureau of Competition, Federal Trade Commission, Medical Participation in Control of Blue Shield and Certain Other Open-Panel Medical Prepayment Plans 128 (1979). We do not suggest

record indicates that the Arizona Comprehensive Medical/ Dental Program for Foster Children is administered by the Maricopa Foundation pursuant to a contract under which the maximum-fee schedule is prescribed by a state agency rather than by the doctors.[27]  This program and the Blue Shield plan challenged in *Group Life & Health Insurance Co.* v. *Royal Drug Co.*, 440 U. S. 205 (1979), indicate that insurers are capable not only of fixing maximum reimbursable prices but also of obtaining binding agreements with providers guaranteeing the insured full reimbursement of a participating provider's fee.  In light of these examples, it is not surprising that nothing in the record even arguably supports the conclusion that this type of insurance program could not function if the fee schedules were set in a different way.

The most that can be said for having doctors fix the maximum prices is that doctors may be able to do it more efficiently than insurers.  The validity of that assumption is far from obvious,[28] but in any event there is no reason to believe

---

that Blue Shield plans are not actually controlled by doctors.  Indeed, as the same report discusses at length, the belief that they are has given rise to considerable antitrust litigation.  See also D. Kass & P. Pautler, Bureau of Economics, Federal Trade Commission, Staff Report on Physician Control of Blue Shield Plans (1979).  Nor does this case present the question whether an insurer may, consistent with the Sherman Act, fix the fee schedule and enter into bilateral contracts with individual doctors.  That question was not reached in *Group Life & Health Insurance Co.* v. *Royal Drug Co.*, 440 U. S. 205 (1979).  See *id.*, at 210, n. 5.  In an *amicus curiae* brief, the United States expressed its opinion that such an arrangement would be legal unless the plaintiffs could establish that a conspiracy among providers was at work.  Brief for United States as *Amicus Curiae*, O. T. 1978, No. 77–952, pp. 10–11.  Our point is simply that the record provides no factual basis for the respondents' claim that the doctors must fix the fee schedule.

[27] In that program the foundation performs the peer review function as well as the administrative function of paying the doctors' claims.

[28] In order to create an insurance plan under which the doctor would agree to accept as full payment a fee prescribed in a fixed schedule, someone must canvass the doctors to determine what maximum prices would be high enough to attract sufficient numbers of individual doctors to sign up

that any savings that might accrue from this arrangement would be sufficiently great to affect the competitiveness of these kinds of insurance plans. It is entirely possible that the potential or actual power of the foundations to dictate the terms of such insurance plans may more than offset the theoretical efficiencies upon which the respondents' defense ultimately rests.[29]

## C

Our adherence to the *per se* rule is grounded not only on economic prediction, judicial convenience, and business certainty, but also on a recognition of the respective roles of the Judiciary and the Congress in regulating the economy. *United States* v. *Topco Associates, Inc.,* 405 U. S., at 611–612. Given its generality, our enforcement of the Sherman Act has required the Court to provide much of its substantive content. By articulating the rules of law with some clarity and by adhering to rules that are justified in their general application, however, we enhance the legislative prerogative to amend the law. The respondents' arguments against application of the *per se* rule in this case therefore are

---

but low enough to make the insurance plan competitive. In this case that canvassing function is performed by the foundation; the foundation then deals with the insurer. It would seem that an insurer could simply bypass the foundation by performing the canvassing function and dealing with the doctors itself. Under the foundation plan, each doctor must look at the maximum-fee schedule fixed by his competitors and vote for or against approval of the plan (and, if the plan is approved by majority vote, he must continue or revoke his foundation membership). A similar, if to some extent more protracted, process would occur if it were each insurer that offered the maximum-fee schedule to each doctor.

[29] In this case it appears that the fees are set by a group with substantial power in the market for medical services, and that there is competition among insurance companies in the sale of medical insurance. Under these circumstances the insurance companies are not likely to have significantly greater bargaining power against a monopoly of doctors than would individual consumers of medical services.

better directed to the Legislature. Congress may consider the exception that we are not free to read into the statute.[30]

## IV

Having declined the respondents' invitation to cut back on the *per se* rule against price fixing, we are left with the respondents' argument that their fee schedules involve price fixing in only a literal sense. For this argument, the respondents rely upon *Broadcast Music, Inc.* v. *Columbia Broadcasting System, Inc.*, 441 U. S. 1 (1979).

In *Broadcast Music* we were confronted with an antitrust challenge to the marketing of the right to use copyrighted compositions derived from the entire membership of the American Society of Composers, Authors and Publishers (ASCAP). The so-called "blanket license" was entirely different from the product that any one composer was able to sell by himself.[31] Although there was little competition among individual composers for their separate compositions, the blanket-license arrangement did not place any restraint on the right of any individual copyright owner to sell his own compositions separately to any buyer at any price.[32] But a

---

[30] "[Congress] can, of course, make *per se* rules inapplicable in some or all cases, and leave courts free to ramble through the wilds of economic theory in order to maintain a flexible approach." *United States* v. *Topco Associates, Inc.*, 405 U. S., at 610, n. 10. Indeed, it has exempted certain industries from the full reach of the Sherman Act. See, *e. g.*, 7 U. S. C. §§ 291, 292 (Capper-Volstead Act, agricultural cooperatives); 15 U. S. C. §§ 1011–1013 (McCarran-Ferguson Act, insurance); 49 U. S. C. § 5b (Reed-Bulwinkle Act, rail and motor carrier rate-fixing bureaus); 15 U. S. C. § 1801 (newspaper joint operating agreements).

[31] "Thus, to the extent the blanket license is a different product, ASCAP is not really a joint sales agency offering the individual goods of many sellers, but is a separate seller offering its blanket license, of which the individual compositions are raw material." 441 U. S., at 22 (footnote omitted).

[32] "Here, the blanket-license fee is not set by competition among individual copyright owners, and it is a fee for the use of any of the compositions

"necessary consequence" of the creation of the blanket license was that its price had to be established. *Id.*, at 21. We held that the delegation by the composers to ASCAP of the power to fix the price for the blanket license was not a species of the price-fixing agreements categorically forbidden by the Sherman Act. The record disclosed price fixing only in a "literal sense." *Id.*, at 8.

This case is fundamentally different. Each of the foundations is composed of individual practitioners who compete with one another for patients. Neither the foundations nor the doctors sell insurance, and they derive no profits from the sale of health insurance policies. The members of the foundations sell medical services. Their combination in the form of the foundation does not permit them to sell any different product.[33] Their combination has merely permitted them to sell their services to certain customers at fixed prices and arguably to affect the prevailing market price of medical care.

The foundations are not analogous to partnerships or other joint arrangements in which persons who would otherwise be competitors pool their capital and share the risks of loss as well as the opportunities for profit. In such joint ventures, the partnership is regarded as a single firm competing with other sellers in the market. The agreement under attack is

covered by the license. But the blanket license cannot be wholly equated with a simple horizontal arrangement among competitors. ASCAP does set the price for its blanket license, but that license is quite different from anything any individual owner could issue. The individual composers and authors have neither agreed not to sell individually in any other market nor use the blanket license to mask price fixing in such other markets." *Id.*, at 23–24 (footnote omitted).

[33] It may be true that by becoming a member of the foundation the individual practitioner obtains a competitive advantage in the market for medical services that he could not unilaterally obtain. That competitive advantage is the ability to attract as customers people who value both the guarantee of full health coverage and a choice of doctors. But, as we have indicated, the setting of the price *by doctors* is not a "necessary consequence" of an arrangement with an insurer in which the doctor agrees not to charge certain insured customers more than a fixed price.

an agreement among hundreds of competing doctors concerning the price at which each will offer his own services to a substantial number of consumers. It is true that some are surgeons, some anesthesiologists, and some psychiatrists, but the doctors do not sell a package of three kinds of services. If a clinic offered complete medical coverage for a flat fee, the cooperating doctors would have the type of partnership arrangement in which a price-fixing agreement among the doctors would be perfectly proper. But the fee agreements disclosed by the record in this case are among independent competing entrepreneurs. They fit squarely into the horizontal price-fixing mold.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE BLACKMUN and JUSTICE O'CONNOR took no part in the consideration or decision of this case.

JUSTICE POWELL, with whom THE CHIEF JUSTICE and JUSTICE REHNQUIST join, dissenting.

The medical care plan condemned by the Court today is a comparatively new method of providing insured medical services at predetermined maximum costs. It involves no coercion. Medical insurance companies, physicians, and patients alike are free to participate or not as they choose. On its face, the plan seems to be in the public interest.

The State of Arizona challenged the plan on a *per se* antitrust theory. The District Court denied the State's summary judgment motion, and—because of the novelty of the issue—certified the question of *per se* liability for an interlocutory appeal. On summary judgment, the record and all inferences therefrom must be viewed in the light most favorable to the respondents. Nevertheless, rather than identifying clearly the controlling principles and remanding for decision on a completed record, this Court makes its own *per se* judgment of invalidity. The respondents' contention that

the "consumers" of medical services are benefited substantially by the plan is given short shrift. The Court concedes that "the parties conducted [only] a limited amount of pretrial discovery," *ante*, at 336, leaving undeveloped facts critical to an informed decision of this case. I do not think today's decision on an incomplete record is consistent with proper judicial resolution of an issue of this complexity, novelty, and importance to the public. I therefore dissent.

## I

The Maricopa and Pima Foundations for Medical Care are professional associations of physicians organized by the medical societies in their respective counties.[1] The foundations were established to make available a type of prepaid medical insurance plan, aspects of which are the target of this litigation. Under the plan, the foundations insure no risks themselves. Rather, their key function is to secure agreement among their member physicians to a maximum-price schedule for specific medical services. Once a fee schedule has been agreed upon following a process of consultation and balloting, the foundations invite private insurance companies to participate by offering medical insurance policies based upon the maximum-fee schedule.[2] The insurers agree to offer com-

---

[1] The Pima Foundation is open to any Pima County area physician licensed in Arizona. It has a renewable 5-year membership term. A voluntary resignation provision permits earlier exit on the January 1 following announcement of an intent to resign.

The Maricopa Foundation admits physicians who are members of their county medical society. The Maricopa Foundation has a renewable 1-year term of membership. Initial membership may be for a term of less than a year so that a uniform annual termination date for all members can be maintained.

The medical *societies* are professional associations of physicians practicing in the particular county. The Pima County Medical Society, but not the Pima Foundation, has been dismissed from the case pursuant to a consent decree.

[2] Three private carriers underwrite various Pima Foundation-sponsored plans: Arizona Blue Cross-Blue Shield, Pacific Mutual Life Insurance Co.,

plete reimbursement to their insureds for the full amount of their medical bills—so long as these bills do not exceed the maximum-fee schedule.

An insured under a foundation-sponsored plan is free to go to any physician. The physician then bills the foundation directly for services performed.[3] If the insured has chosen a physician who is *not* a foundation member and the bill exceeds the foundation maximum-fee schedule, the insured is liable for the excess. If the billing physician *is* a foundation member, the foundation disallows the excess pursuant to the agreement each physician executed upon joining the foundation.[4] Thus, the plan offers complete coverage of medical expenses but still permits an insured to choose any physician.

## II

This case comes to us on a plaintiff's motion for summary judgment after only limited discovery. Therefore, as noted above, the inferences to be drawn from the record must be viewed in the light most favorable to the respondents. *United States* v. *Diebold, Inc.*, 369 U. S. 654, 655 (1962).

---

and Connecticut General Life Insurance Co. The latter two companies also underwrite plans for the Maricopa Foundation, as do five other private insurance companies. Apparently large employers, such as the State of Arizona and Motorola, also act as foundation-approved insurers with respect to their employees' insurance plans.

[3] The foundations act as the insurance companies' claims agents on a contract basis. They administer the claims and, to some extent, review the medical necessity and propriety of the treatment for which a claim is entered. The foundations charge insurers a fee for their various services. In recent years, this fee has been set at 4% of the insurers' premiums.

[4] This agreement provides in part that the physician agrees "to be bound . . . with respect to maximum fees . . . by any fee determination by the [f]oundation consistent with the schedule adopted by the [foundation physician] membership . . . ." App. 31–32. The agreement also provides that foundation members "understand and agree that participating membership in the [f]oundation shall not affect the method of computation or amount of fees billed by me with respect to any medical care for any patient." *Ibid.*

This requires, as the Court acknowledges, that we consider the foundation arrangement as one that "impose[s] a meaningful limit on physicians' charges," that "enables the insurance carriers to limit and to calculate more efficiently the risks they underwrite," and that "therefore serves as an effective cost containment mechanism that has saved patients and insurers millions of dollars." *Ante*, at 342. The question is whether we should condemn this arrangement forthwith under the Sherman Act, a law designed to *benefit* consumers.

Several other aspects of the record are of key significance but are not stressed by the Court. First, the foundation arrangement forecloses *no* competition. Unlike the classic cartel agreement, the foundation plan does not instruct potential competitors: "Deal with consumers on the following terms and no others." Rather, physicians who participate in the foundation plan are free both to associate with other medical insurance plans—at any fee level, high or low—and directly to serve uninsured patients—at any fee level, high or low. Similarly, insurers that participate in the foundation plan also remain at liberty to do business outside the plan with any physician—foundation member or not—at any fee level. Nor are physicians locked into a plan for more than one year's membership. See n. 1, *supra*. Thus freedom to compete, as well as freedom to withdraw, is preserved. The Court cites no case in which a remotely comparable plan or agreement is condemned on a *per se* basis.

Second, on this record we must find that insurers represent consumer interests. Normally consumers search for high quality at low prices. But once a consumer is insured[5]—*i. e.*, has chosen a medical insurance plan—he is

---

[5] At least seven insurance companies are competing in the relevant market. See n. 2, *supra*. At this stage of the case we must infer that they are competing vigorously and successfully.

The term "consumer"—commonly used in antitrust cases and literature—is used herein to mean persons who need or may need medical services from a physician.

largely indifferent to the amount that his physician charges if the coverage is full, as under the foundation-sponsored plan.

The insurer, however, is *not* indifferent. To keep insurance premiums at a competitive level and to remain profitable, insurers—including those who have contracts with the foundations—step into the consumer's shoes with his incentive to contain medical costs. Indeed, insurers may be the only parties who have the effective power to restrain medical costs, given the difficulty that patients experience in comparing price and quality for a professional service such as medical care.

On the record before us, there is no evidence of opposition to the foundation plan by insurance companies—or, for that matter, by members of the public. Rather seven insurers willingly have chosen to contract out to the foundations the task of developing maximum-fee schedules.[6] Again, on the record before us, we must infer that the foundation plan—open as it is to insurers, physicians, and the public—has in fact benefited consumers by "enabl[ing] the insurance carriers to limit and to calculate more efficiently the risks they underwrite." *Ante*, at 342. Nevertheless, even though the case is here on an incomplete summary judgment record, the Court conclusively draws contrary inferences to support its *per se* judgment.

### III

It is settled law that once an arrangement has been labeled as "price fixing" it is to be condemned *per se*. But it is equally well settled that this characterization is not to be ap-

---

[6] The State introduced no evidence on its summary judgment motion supporting its apparent view that insurers effectively can perform this function themselves, without physician participation. It is clear, however, that price and quality of professional services—unlike commercial products—are difficult to compare. Cf. *Bates* v. *State Bar of Arizona*, 433 U. S. 350, 391–395 (1977) (opinion of POWELL, J.). This is particularly true of medical service. Presumably this is a reason participating insurers wish to utilize the foundations' services.

plied as a talisman to every arrangement that involves a literal fixing of prices. Many lawful contracts, mergers, and partnerships fix prices. But our cases require a more discerning approach. The inquiry in an antitrust case is not simply one of "determining whether two or more potential competitors have literally 'fixed' a 'price.' . . . [Rather], it is necessary to characterize the challenged conduct as falling within or without that category of behavior to which we apply the label '*per se* price fixing.' That will often, but not always, be a simple matter." *Broadcast Music, Inc.* v. *Columbia Broadcasting System, Inc.*, 441 U. S. 1, 9 (1979).

Before characterizing an arrangement as a *per se* price-fixing agreement meriting condemnation, a court should determine whether it is a "'naked restrain[t] of trade with no purpose except stifling of competition.'" *United States* v. *Topco Associates, Inc.*, 405 U. S. 596, 608 (1972), quoting *White Motor Co.* v. *United States*, 372 U. S. 253, 263 (1963). See also *Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U. S. 36, 49–50 (1977). Such a determination is necessary because "departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than . . . upon formalistic line drawing." *Id.*, at 58–59. As part of this inquiry, a court must determine whether the procompetitive economies that the arrangement purportedly makes possible are substantial and realizable in the absence of such an agreement.

For example, in *National Society of Professional Engineers* v. *United States*, 435 U. S. 679 (1978), we held unlawful as a *per se* violation an engineering association's canon of ethics that prohibited competitive bidding by its members. After the parties had "compiled a voluminous discovery and trial record," *id.*, at 685, we carefully considered—rather than rejected out of hand—the engineers' "affirmative defense" of their agreement: that competitive bidding would tempt engineers to do inferior work that would threaten pub-

lic health and safety. *Id.*, at 693. We refused to accept this defense because its merits "confirm[ed] rather than refut[ed] the anticompetitive purpose and effect of [the] agreement." *Ibid.* The analysis incident to the "price fixing" characterization found no substantial procompetitive efficiencies. See also *Catalano, Inc.* v. *Target Sales, Inc.*, 446 U. S. 643, 646, n. 8, and 649–650 (1980) (challenged arrangement condemned because it lacked "a procompetitive justification" and had "no apparent potentially redeeming value").

In *Broadcast Music, Inc.* v. *Columbia Broadcasting System, Inc., supra,* there *was* minimum price fixing in the most "literal sense." *Id.*, at 8. We nevertheless agreed, unanimously,[7] that an arrangement by which copyright clearinghouses sold performance rights to their entire libraries on a blanket rather than individual basis did not warrant condemnation on a *per se* basis. Individual licensing would have allowed competition between copyright owners. But we reasoned that licensing on a blanket basis yielded substantial efficiencies that otherwise could not be realized. See *id.*, at 20–21. Indeed, the blanket license was itself "to some extent, a different product." *Id.*, at 22.[8]

In sum, the fact that a foundation-sponsored health insurance plan *literally* involves the setting of ceiling prices among competing physicians does not, of itself, justify condemning the plan as *per se* illegal. Only if it is clear from the record that the agreement among physicians is "so plainly

---

[7] See *Broadcast Music, Inc.* v. *Columbia Broadcasting System, Inc.*, 441 U. S., at 25 (STEVENS, J., dissenting in part) ("The Court holds that ASCAP's blanket license is not a species of price fixing categorically forbidden by the Sherman Act. I agree with that holding").

[8] Cf. *Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U. S. 36, 54 (1977) (identifying achievement of efficiencies as "redeeming virtue" in decision sustaining an agreement against *per se* challenge); L. Sullivan, Law of Antitrust § 74, p. 200 (1977) (*per se* characterization inappropriate if price agreement achieves great economies of scale and thereby improves economic performance); *id.*, § 66, p. 180 (higher burden might reasonably be placed on plaintiff where agreement may involve efficiencies).

anticompetitive that no elaborate study of [its effects] is needed to establish [its] illegality" may a court properly make a *per se* judgment. *National Society of Professional Engineers* v. *United States, supra,* at 692. And, as our cases demonstrate, the *per se* label should not be assigned without carefully considering substantial benefits and procompetitive justifications. This is especially true when the agreement under attack is novel, as in this case. See *Broadcast Music, supra,* at 9–10; *United States* v. *Topco Associates, Inc., supra,* at 607–608 ("It is only after considerable experience with certain business relationships that courts classify them as *per se* violations").

## IV

The Court acknowledges that the *per se* ban against price fixing is not to be invoked every time potential competitors *literally* fix prices. *Ante,* at 355–357. One also would have expected it to acknowledge that *per se* characterization is inappropriate if the challenged agreement or plan achieves for the public procompetitive benefits that otherwise are not attainable. The Court does not do this. And neither does it provide alternative criteria by which the *per se* characterization is to be determined. It is content simply to brand this type of plan as "price fixing" and describe the agreement in *Broadcast Music*—which also literally involved the fixing of prices—as "fundamentally different." *Ante,* at 356.

In fact, however, the two agreements are similar in important respects. Each involved competitors and resulted in cooperative pricing.[9] Each arrangement also was prompted

---

[9] In this case the physicians in effect vote on foundation maximum-fee schedules. In *Broadcast Music,* the copyright owners aggregated their copyrights into a group package, sold rights to the package at a group price, and distributed the proceeds among themselves according to an agreed-upon formula. See *Columbia Broadcasting System, Inc.* v. *American Society of Composers, Authors and Publishers,* 562 F. 2d 130, 135–136 (CA2 1977).

by the need for better service to the consumers.[10]   And each arrangement apparently makes possible a new product by reaping otherwise unattainable efficiencies.[11]   The Court's effort to distinguish *Broadcast Music* thus is unconvincing.[12]

---

[10] In this case, the foundations' maximum-fee schedules attempt to rectify the inflationary consequence of patients' indifference to the size of physicians' bills and insurers' commitment to reimburse whatever "usual, customary, and reasonable" charges physicians may submit.   In *Broadcast Music*, the market defect inhered in the fact that "those who performed copyrighted music for profit were so numerous and widespread, and most performances so fleeting, that as a practical matter it was impossible for the many individual copyright owners to negotiate with and license the users and to detect unauthorized uses."   441 U. S., at 4–5.

[11] In this case, the record before us indicates that insurers—those best situated to decide and best motivated to inspire trust in their judgment—believe that the foundations are the most efficient providers of the maximum-fee scheduling service.   In *Broadcast Music*, we found that the blanket copyright clearinghouse system "reduce[d] costs absolutely . . . ."   *Id.*, at 21.

[12] The Court states that in *Broadcast Music* "there was little competition among individual composers for their separate compositions."   *Ante*, at 355.   This is an irrational ground for distinction.   Competition *could* have existed, 441 U. S., at 6; see also 562 F. 2d, at 134–135, 138, but did not because of the cooperative agreement.   That competition yet persists among *physicians* is not a sensible reason to invalidate their agreement while refusing similarly to condemn the *Broadcast Music* agreements that were *completely* effective in eliminating competition.

The Court also offers as a distinction that the foundations do not permit the creation of "any different product."   *Ante*, at 356.   But the foundations provide a "different product" to precisely the same extent as did *Broadcast Music*'s clearinghouses.   The clearinghouses provided only what copyright holders offered as individual sellers—the rights to use individual compositions.   The clearinghouses were able to obtain these same rights more efficiently, however, because they eliminated the need to engage in individual bargaining with each individual copyright owner.   See 441 U. S., at 21–22.

In the same manner, the foundations set up an innovative means to deliver a basic service—insured medical care from a wide range of physicians of one's choice—in a more economical manner.   The foundations' maximum-fee schedules replace the weak cost containment incentives in typical

The Court, in defending its holding, also suggests that "respondents' arguments against application of the *per se* rule . . . are better directed to the Legislature." *Ante,* at 354–355. This is curious advice. The Sherman Act does not mention *per se* rules. And it was not Congress that decided *Broadcast Music* and the other relevant cases. Since the enactment of the Sherman Act in 1890, it has been the duty of *courts* to interpret and apply its general mandate—and to do so for the benefit of consumers.

As in *Broadcast Music*, the plaintiff here has not yet discharged its burden of proving that respondents have entered a plainly anticompetitive combination without a substantial and procompetitive efficiency justification. In my view, the District Court therefore correctly refused to grant the State's motion for summary judgment.[13] This critical and disputed issue of fact remains unresolved. See Fed. Rule Civ. Proc. 56(c).

---

"usual, customary, and reasonable" insurance agreements with a stronger cost control mechanism: an absolute ceiling on maximum fees that can be charged. The conduct of the insurers in this case indicates that they believe that the foundation plan as it presently exists is the most efficient means of developing and administering such schedules. At this stage in the litigation, therefore, we must agree that the foundation plan permits the more economical delivery of the basic insurance service—"to some extent, a different product." *Broadcast Music,* 441 U. S., at 22.

[13] Medical services differ from the typical service or commercial product at issue in an antitrust case. The services of physicians, rendered on a patient-by-patient basis, rarely can be compared by the recipient. A person requiring medical service or advice has no ready way of comparing physicians or of "shopping" for quality medical service at a lesser price. Primarily for this reason, the foundations—operating the plan at issue—perform a function that neither physicians nor prospective patients can perform individually. On a collective—and average—basis, the physicians themselves express a willingness to render certain identifiable services for not more than specified fees, leaving patients free to choose the physician. We thus have a case in which we derive little guidance from the conventional "perfect market" analysis of antitrust law. I would give greater weight than the Court to the uniqueness of medical services, and certainly would not invalidate on a *per se* basis a plan that may in fact perform a uniquely useful service.

## V

I believe the Court's action today loses sight of the basic purposes of the Sherman Act. As we have noted, the antitrust laws are a "consumer welfare prescription." *Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 343 (1979). In its rush to condemn a novel plan about which it knows very little, the Court suggests that this end is achieved only by invalidating activities that *may* have some potential for harm. But the little that the record does show about the effect of the plan suggests that it is a means of providing medical services that in fact benefits rather than injures persons who need them.

In a complex economy, complex economic arrangements are commonplace. It is unwise for the Court, in a case as novel and important as this one, to make a final judgment in the absence of a complete record and where mandatory inferences create critical issues of fact.

---

Affirmance of the District Court's holding would not have immunized the medical service plan at issue. Nor would it have foreclosed an eventual conclusion on remand that the arrangement should be deemed *per se* invalid. And if the District Court had found that petitioner had failed to establish a *per se* violation of the Sherman Act, the question would have remained whether the plan comports with the rule of reason. See, *e. g.*, *United States* v. *United States Gypsum Co.*, 438 U. S. 422, 441, n. 16 (1978).