UNITED STATES of America

v.

BROWN UNIVERSITY IN PROVIDENCE IN THE STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS; the Trustees of Columbia University in the City of New York; Cornell University; the Trustees of Dartmouth College; President and Fellows of Harvard College, Massachusetts; Massachusetts Institute of Technology; the Trustees of Princeton University; the Trustees of the University of Pennsylvania; and Yale University.

Civ. A. No. 91–3274.

United States District Court,
E.D. Pennsylvania.

Sept. 2, 1992.

## DECISION AND ORDER

BECHTLE, Chief Judge.

### I. INTRODUCTION

The United States brought the instant action after a two-year investigation of the financial aid programs of various colleges and universities across the country. In its one-count verified complaint, the government alleged that the above-captioned defendants unlawfully conspired to restrain trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1 (1990), by collectively determining the amount of financial assistance awarded to students. The court entered final judgment against all defendants, with their consent, except for Massachusetts Institute of Technology which decided to defend against the charges. After a non-jury trial, the court renders the following decision:

### II. FINDINGS OF FACT

1. Defendant, Massachusetts Institute of Technology ("MIT"), is a non-profit institution of higher education. MIT is incorporated under the laws of Massachusetts.

2. According to its charter, granted in 1861, MIT was incorporated:

> [f]or the purpose of instituting and maintaining a society of arts, a museum of arts, and a school of industrial science, and aiding generally, by suitable means, the advancement, development and practical application of science in connection with arts, agriculture, manufactures and commerce....

Michael M. Baylson, U.S. Atty., Philadelphia, Pa., D. Bruce Pearson, Jessica N. Cohen, Jon B. Jacobs, Seymour H. Dussman, Michael P. Gaughan, Joseph H. Widmar, and Robert E. Bloch, U.S. Dept. of Justice, Washington, D.C., for plaintiff U.S.

Thane D. Scott, Robert E. Sullivan, Michael T. Gass, Bruce D. Berns, and Anita M. Polli, Palmer & Dodge, Boston, Mass., Andre L. Dennis, Stradley, Ronon, Stevens & Young, Philadelphia, Pa., for defendant Massachusetts Institute of Technology.

3. MIT is governed by the MIT Corporation, over which the Chairman presides, and an Executive Committee. The MIT Corporation is comprised of 70 elected volunteer members, including distinguished leaders in science, engineering, industry, education and public service, and eight *ex officio* members. The Governor of Massachusetts, the Chief Justice of the Massachusetts Supreme Judicial Court, and the Massachusetts Commissioner of Education are all *ex officio* members of the MIT Corporation.

4. The Executive Committee is comprised of ten members. Seven of those are drawn from the 70 elected volunteer board members and the other three are the Chairman, President and Treasurer of MIT. The Executive Committee is responsible for the oversight of MIT's operations.

5. MIT's operating budget is approximately $1.1 billion. MIT maintains an endowment of approximately $1.5 billion (which consistently ranks among the ten largest in the nation) and receives tuition payments and other income of approximately $158 million.

6. MIT offers undergraduate and graduate programs. MIT's educational programs are provided through five schools, engineering, science, architecture and planning, management, and humanities and social science.

7. Each year MIT receives several thousand applications, including many from students who are not Massachusetts residents, some of whom ultimately enroll at MIT. Many applications for admission are transported to MIT from other states. MIT receives money, including charitable donations and non-refundable application fees, from out-of-state residents.

8. The Ivy League is an organization made up of eight institutions of higher education. The eight Ivy League schools are Brown University, Columbia University, Cornell University, Dartmouth College, Harvard University, Princeton University, the University of Pennsylvania, and Yale University.

9. MIT and the Ivy League schools are included among the group of elite higher education institutions in the country. MIT and the Ivy League schools comprise the Ivy Overlap Group.

10. MIT has also been an associate member of the Pentagonal/Sisters Overlap Group, which included the five "Pentagonal" schools (Amherst, Williams, Wesleyan, Bowdoin, and Dartmouth), the "Seven Sisters" schools (Barnard, Bryn Mawr, Mount Holyoke, Radcliffe, Smith, Vassar, and Wellesely) and four other schools (Colby, Middlebury, Trinity, and Tufts).

## MIT'S ADMISSION PRACTICES AND POLICIES

11. Each year MIT receives between six and seven thousand applications from prospective students. Approximately 2,000 students are admitted, approximately 1,100 of whom ultimately enroll.

12. In deciding whether to admit applicants, MIT evaluates the applicants' grades, class rank, performance on scholastic aptitude and achievement tests, the quality of their high school academic program, and personal accomplishments.

13. MIT seeks to admit very able students. For example, in the 1991–92 academic year, 259 of the 880 MIT freshmen who had high school ranks were class valedictorians, and 83% were in the top 5% of their high school classes. Of that same MIT entering class, 50% had math SAT scores above 750 (out of a possible 800) and 80% had math scores over 700. The average math SAT score for the 1992–1993 freshmen class was 735.

14. MIT's principal competitors for "high quality" undergraduate students are Harvard, Princeton, Stanford, and Yale.

15. For the 1991–92 academic year, the undergraduate enrollment was approximately 4,400 students.

16. MIT regularly conducts reply studies of its admitted students. In 1988, 82% of all students admitted to MIT attended MIT, another Ivy Overlap Group school, or Stanford. Eighty-eight percent of students admitted to MIT considered to be the "highest achievers" enrolled in these schools.

17. MIT employs a "need-blind admissions" system. Under this system, all admission decisions are based entirely on an applicant's merit, without any regard to the applicant's financial circumstances or ability to pay.

18. It is also MIT's policy to meet the full financial aid needs of attending students. When available resources do not meet students' financial need, MIT subsidizes the balance through additional assistance in the form of institutional grants.

19. MIT's policies of need-blind admissions and need-based aid have allowed many students to attend MIT who, for a lack of financial resources, otherwise would not have been able to attend.

20. For the 1991–92 academic year, approximately 44% of the undergraduate enrollment were from American minority groups. By contrast, three decades ago, little more than 3% or 4% of MIT's undergraduate student body were from American minority groups.

21. For the 1991–92 academic year, 57% of students attending MIT received financial aid from MIT.

*THE FINANCIAL AID PROCESS*

22. Under the federal financial aid program, students and their families are expected to use their combined assets in order to finance the student's college education. *See* 20 U.S.C. §§ 1078(a)(2) and 1087mm (1989).

23. When family assets are insufficient to meet college expenses, the student becomes eligible for federal loans or loan guarantees. *See* 20 U.S.C. § 1078(a)(2), 1087kk and 1087mm.

24. In order to qualify for federally funded financial aid, students and their families must disclose financial information by completing the College Scholarship Service's ("CSS") Financial Aid Form ("FAF").

25. CSS is a branch of the College Board's Educational Testing Service. CSS functions as the principal processor for financial aid programs in the United States.

26. CSS collects financial information from aid applicants, processes that information using a standardized formula, and distributes that information to participating institutions. More than 2,000 colleges and universities rely on CSS for processing financial aid data.

27. The FAF solicits detailed information concerning the income and assets of financial aid applicants. This information includes the adjusted gross income of the student and his or her parents from the previous year's federal income tax return, the number of dependents, the number of family members enrolled in private elementary, secondary and post-secondary institutions, and the net assets of the student and the parents.

28. CSS processes the information on the FAF and sends the data to the United States Department of Education, which makes the initial calculation of each aid applicant's expected "family contribution."

29. The family contribution is the amount which the student and his or her family may be reasonably expected to contribute towards his or her educational expenses for one year. *See* 20 U.S.C. § 1087mm. The family contribution comprised of two parts: the parent contribution and the student contribution.

30. The Department of Education sends its family contribution determination back to CSS. CSS then incorporates the data into its Financial Aid Form Needs Analysis Report ("FAFNAR"). CSS sends the FAFNAR to the applicant and each school to which the applicant has applied.

31. Presently, the Department of Education determines family contribution by using the "Congressional Methodology," which is the needs analysis methodology required by the Higher Education Amendments of 1986 for the awarding of federally-funded or federally-guaranteed financial aid. *See* 20 U.S.C. § 1087nn, *et seq.*

32. Federal financial aid policy aims to ensure that similarly situated students are treated the same regardless of which institution, or aid officer within that institution, reviews their applications, and that students with less financial need do not receive more aid than those students with more financial need.

33. The Congressional Methodology became effective for the 1988–89 academic year. Prior to the enactment of the Congressional Methodology, CSS determined family contribution by applying the "Uniform Methodology," which was approved by the Department of Education as an acceptable methodology for distributing federal financial aid funds.

34. Under the Congressional Methodology, a school may either increase or decrease the Department of Education's fami-

ly contribution determination by that school's using its "professional judgment."

35. A school is permitted to use its professional judgment when "special circumstances" exist. Professional judgment may be used on a case-by-case basis only; schools may not consider special circumstances that exist among a class of students. *See* 20 U.S.C. § 1087tt.

36. Professional judgment could be used, for example, if an institution's financial aid officer concluded that there was a significant change in the financial condition of a family, or if the cost for room and board turned out to be higher than was previously estimated.

37. Guidelines do not exist for the use of professional judgment. Various colleges may choose to apply professional judgment in different ways and under different circumstances. As a result, through the use of professional judgment, different schools may end up with divergent family contribution determinations with respect to the same applicant even though both schools used the Congressional Methodology.

38. The Department of Education recommends that professional judgment be used sparingly.

39. In addition to the information provided to CSS, individual schools may require applicants to provide additional financial information.

40. MIT requires its applicants to complete the MIT Financial Aid Application and submit copies of the applicants' and their parents' latest federal tax returns. In cases where the applicants' parents are divorced or separated, MIT requires the completion of a Divorced/Separated Parent's Statement.

41. MIT determines a student's "financial need" by subtracting its family contribution determination from the applicant's "student budget."

42. The student budget includes tuition, room and board, and other expenses such as books, materials, and travel.

43. MIT's current student budget is approximately $25,000.

44. There are two types of financial aid: grants and self-help.

45. Grants are financial assistance which the recipient is not required to repay.

46. Self-help is assistance in the form of loans or school-year employment opportunities. Each institution maintains its own self-help "level," which is the minimum amount all students are expected to provide themselves. Awards of self-help alone satisfy the demonstrated financial need of fewer than 9% of all aid recipients at MIT.

47. MIT's standard self-help level for the 1991–92 academic year was $6,100.

48. Students whose need exceeds the self-help levels require additional assistance. Approximately 91% of MIT aid recipients receive this additional assistance in the form of grants.

49. If a student receives any federal need-based aid, he or she may not receive additional aid from an institution which would exceed his or her need as calculated under the Congressional Methodology. Such aid is considered an "overaward."

50. If a student receives one dollar from a federal need-based aid program, all financial aid funds provided to that student must be awarded on the basis of need.

*OVERLAP PROCESS*

51. The Ivy Overlap Group was created in 1958 by MIT and the Ivy League schools. The purpose of the Ivy Overlap Group is set forth in the Manual of the Council of Ivy League Presidents ("Manual").

52. Under the caption "Financial Aid policies and procedures," the Manual states the following:

1. Member institutions agree that the primary purpose of a college financial aid program for all students is to provide financial assistance to students who without such aid would be unable to attend that institution. Financial aid should only be awarded after it is determined that family resources are inadequate to meet the student's educational expenses, and such aid should not exceed the difference between educational expenses and family re-

sources. MIT is considered a member of the Ivy Group for purposes of these rules.

2. Ivy Group institutions follow the common policy that any financial aid shall be awarded solely on the basis of demonstrated need. Moreover, in order to insure that financial awards to commonly admitted candidates are reasonably comparable, all Ivy Group institutions will share financial information concerning admitted candidates in an annual "Ivy Overlap" meeting just prior to the mid-April common notification date. *The purpose of the compare agreement is to neutralize the effect of financial aid so that a student may choose among Ivy Group institutions for non-financial reasons.*

a. *Family contributions shall be compared and adjusted if necessary so that, as a general rule, families will be asked to pay approximately the same amount regardless of the Ivy Group institution they choose to attend.* As a result, total financial need should differ by the approximate amount that costs at the respective institutions differ. Also, subject to variations in individual institutional financial aid policy, there is a further goal of establishing a balance between scholarship and self-help that is roughly comparable.

b. Member institutions shall continue to compare late awards and adjustment to awards after the formal overlap session until the student decides which college he or she will attend.

3. So that the process of comparing financial aid awards among member institutions can be facilitated, Ivy Group financial aid directors shall meet as necessary to agree on the basic principles of a financial needs analysis system. In particular they shall agree on a common system for measuring parental ability to pay and also seek to reduce differences in the other elements of needs analysis such as: contributions from student assets and benefits, summer savings expectations, travel allowances, and adjustments for use of outside scholarships. (Manual at X–30–31) (emphasis added).

53. There were three main features of the Ivy Overlap process: all member institutions agreed to (1) award financial aid solely on the basis of applicants' demonstrated financial need, and not on the basis of academic or athletic ability; (2) jointly develop and apply a uniform needs analysis formula for assessing applicants' expected family contribution; and (3) jointly determine and apply the family contribution determinations of commonly admitted students on a case-by-case basis.

54. The Ivy Overlap Group met approximately four times each year.

55. At the "Winter Meeting," usually held in New York City, the participants agreed upon the needs analysis methodology which the Ivy Overlap Group schools would employ in calculating family contribution for the next admitting class.

56. The participants attempted to establish the principles upon which need-assessment practices might be based and professional judgment might be exercised.

57. The agreed-upon principles of needs analysis were called the Ivy Needs Analysis Agreements. The Ivy methodology differed from the Congressional Methodology in significant respects.

58. The most meaningful departures from the Congressional Methodology concerned the apportionment of income when more than one child was attending college, the treatment of capital losses, depreciation losses, and losses from secondary businesses, and, in the case of divorced or separated parents, the treatment of assets of the noncustodial parent.

59. When more than one child in a family is attending college, the Congressional Methodology evenly apportions the parental contribution; for example, if two children in one family are attending college, half the parental contribution would be attributed to each child. By contrast, the Ivy methodology apportioned the family contribution for multiple siblings based on the cost of the colleges the children were at-

tending. The more a college cost, the greater part of the family contribution would be attributed to the student attending that college.

60. The Congressional Methodology subtracts from income the losses reported on parents' tax returns. The Ivy Overlap Group schools did not subtract these losses in calculating income to determine family contribution.

61. In the event a student's parents were divorced or separated, the Congressional Methodology expects a contribution from the custodial parents only. The Ivy Overlap Group schools considered the income of the non-custodial parent.

62. MIT followed the Ivy Needs Analysis Agreements and used the Ivy methodology, with certain exceptions. These exceptions included the treatment of graduate student expenses, private schooling expenses, and certain student assets.

63. The Congressional Methodology expects that 6% of the parents' assets and 35% of the students' assets would be used for education. Apparently, upon the advice of financial planners, the parents of many aid applicants transfer most of the student's assets to the parents' accounts. MIT has observed that needy families do not avail themselves of this practice. With respect to needy families, if MIT finds than an inordinate amount of money is held in the student's name, it assigns a portion of this money to the parents' accounts. Further, unlike the other Ivy Overlap schools, MIT does not require a minimum parental contribution from certain very poor families.

64. At the annual "Spring Meeting," usually held in Wellesley, Massachusetts, the Ivy Overlap Group agreed upon the amount of the family contribution of commonly admitted aid applicants.

65. Prior to the Spring Meeting, financial aid officers at each school would personally review each financial aid application and determine independently the applicant's expected family contribution using the CSS family contribution determination, the Ivy methodology, and the school's professional judgment.

66. In preparation for the Spring Meeting, each institution compiled and then transmitted data concerning aid applicants to Student Aid Services, which is a private data processing company.

67. Student Aid Services used this data to prepare three separate "rosters."

68. The "master roster" comprised all aid applicants who had been admitted to an Ivy Overlap Group school.

69. The "bilateral roster" comprised those aid applicants who were admitted to two Ivy Overlap Group schools.

70. The "multilateral roster" comprised aid applicants who were admitted to three or more Ivy Overlap Group schools.

71. For each applicant, the rosters listed each school's student budget, proposed student and parent contribution, self-help levels, and grant awards.

72. The Spring Meeting lasted two days. The multilateral meetings were chaired by a "driver," who called out each applicant's name and the schools which had admitted that applicant. The schools would then compare their own separately calculated family contribution figures with the other admitting schools' figures for that applicant.

73. More often than not, the family contribution determinations made by the various schools prior to the Spring Meeting were similar. The similarity resulted from the fact that, for the most part, each school used the identical needs analysis formula.

74. Family contribution differences of less than $500 were understood to be close enough not to warrant any discussion aimed at arriving at a common figure.

75. Where there were significant differences (in excess of $500), the schools would either agree upon a common figure or agree to meet somewhere at or near the middle of the divergent figures. Each institution adopted and used these agreed-upon family contribution determinations in making their financial aid awards, and expected the other institutions to do likewise.

76. Due to time limitations at the Spring Meeting and the volume of cross-admitted students, the schools spent no more than a few minutes discussing divergent pre-meeting family contribution figures for individual students. During those few minutes allocated to individual aid applicants, the schools could not and did not make a genuine and concerted effort to assess accurately the aid applicant's actual financial circumstances, notwithstanding the expressed purpose of the Spring Meeting which was to utilize the combined expertise of the schools' financial aid staffs in order to arrive at the correct family contribution figure. The family contribution figures which were eventually agreed upon at the Spring Meeting were more a result of compromise and expediency than a genuine effort, as MIT contends, to "get it right."

77. As a result of the use of a common needs-analysis formula and the Spring Meeting, aid applicants and their families would pay the same amount regardless of which Ivy Overlap Group institution the student decided to attend.

78. Rarely did the participating schools fail to reach an agreement on the amount of the family contribution for individual students.

79. The Ivy Overlap Group schools also participated in a "post-overlap" process. The objective of the post-overlap process remained the same.

80. The post-overlap process involved students who "appealed" the family contribution determination that resulted from the Spring Meeting, students whose applications were incomplete at the time of the Spring Meeting, and students who were admitted from the wait list too late to be included in the Spring Meeting.

81. An Overlap II meeting was usually held to discuss aid applicants within the above categories who were admitted to three or more Ivy Overlap Group schools.

82. Aid applicants admitted to two Ivy Overlap Group schools were discussed by telephone or electronic "Bitnet" communication between the two schools.

83. The family contribution determinations, once agreed upon by the Ivy Overlap Group, remained in full force and effect until the student selected a school or a new agreement was reached between or among the affected schools.

84. Although the Ivy Overlap Group agreed upon the amount of the expected family contribution of aid applicants, the composition of individual aid packages was determined independently among the member institutions.

85. The Ivy Overlap Group also agreed not to provide merit aid to any applicant.

86. Merit aid is aid which is awarded on the basis of a student's personal virtues, such as academic achievement, athletic ability, musical talent, or past participation in extracurricular activities, irrespective of financial circumstances.

87. The Ivy Overlap Group awards aid solely on the basis of students' financial need. Students who have not demonstrated the need for financial assistance are not awarded aid.

88. Although witnesses on behalf of MIT testified at trial that the Ivy Overlap Group did not conceal its activities from the public or student-applicants and their families, the member schools made no effort to publicize the existence, purpose and effect of the Ivy Overlap Agreements.

89. For example, MIT's application brochure provided a step-by-step explanation of the financial aid application and award process. The brochure made no mention of the role which the Ivy Overlap Group played in that process even though Overlap is a standard and integral feature of the financial aid award process. Presumably, students admitted to more than one Ivy Overlap Group school were not aware that their expected family contribution was determined as a result of an arrangement by and between the Ivy Overlap Group schools.

90. The only other institution of higher education that provided the Ivy Overlap Group with any meaningful competition for students was Stanford. The Ivy Overlap Group schools attempted to recruit Stanford into the group for fear that Stanford was luring high caliber students with merit scholarships and larger aid awards. Stanford refused the invitation upon its belief that Overlap violated the antitrust laws.

## ENFORCEMENT OF OVERLAP

91. All Ivy Overlap Group schools recognized that a failure to comply with the Ivy Overlap Agreements could result in severe sanctions from the other institutions. Consequently, "cheating" was rare.

92. The few instances where an Ivy Overlap Group member violated the provisions of the Ivy Overlap Agreements provoked strong complaints from the other Ivy Overlap Group members.

93. In October 1986, Princeton began awarding $1,000 "research grants" to highly qualified undergraduates without regard to need. The other Ivy Overlap Group institutions viewed these awards as a form of merit scholarships which could entice students to attend Princeton and believed that the awards violated the spirit, if not the letter, of the Ivy Overlap Agreements. As a result of a series of complaints, Princeton agreed to abandon the awards.

## III. DISCUSSION AND CONCLUSIONS OF LAW [1]

### COMMERCE

■ MIT contends, as a threshold matter, that the Ivy Overlap Group is not susceptible to antitrust scrutiny because its activities did not constitute trade or commerce. Section 1 of the Sherman Act proscribes "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states...." 15 U.S.C. § 1 (1990). It has become axiomatic that not every combination or conspiracy in restraint of trade or commerce is violative of the Sherman Act. For one thing, the Sherman Act, by its terms, only applies to contracts which restrain interstate trade or commerce.[2] Yet, not all conspiracies that affect interstate commerce are unlawful. The Supreme Court has noted that the Act was aimed at combinations and conspiracies which have commercial objectives and rarely is it applied to organizations or activities which are non-commercial in nature. *Klor's, Inc. v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 213 n. 7, 79 S.Ct. 705, 710 n. 7, 3 L.Ed.2d 741 (1959).

MIT endeavors to except the Overlap process from antitrust liability based on the assertion that it solely implicated non-commercial aspects of higher education. According to MIT, Overlap had a non-commercial impact, was not commercially moti-

---

1. Soon after the trial was completed Congress passed the Higher Education Amendments of 1992. Pub.L. No. 102–325, 106 Stat. 448 (1992). Section 1544 of the Amendments makes lawful, for a two year period, certain Ivy Overlap Group activity which is the subject of this civil action. Section 1544 states in its entirety:

   (a) Effect on Pending Cases Prohibited. Nothing in this section shall in any way be construed to affect any antitrust litigation pending on the date of enactment of this Act.
   (b) In General. Except as provided in subsections (a), (c), and (e), institutions of higher education may—
   (1) voluntarily agree with any other institution of higher education to award financial aid not awarded under the Higher Education Act of 1965 to students attending those institutions only on the basis of demonstrated financial need for such aid; and
   (2) discuss and voluntarily adopt defined principles of professional judgment for determining student financial need for aid not awarded under the Higher Education Act of 1965.
   (c) Exception. Institutions of higher education shall not discuss or agree with each other on the prospective financial aid award to a specific common applicant for financial aid.
   (d) Related Matter. No inference of unlawful contract, combination, or conspiracy shall be drawn from the fact that institutions of higher education engage in conduct authorized by this section.
   (e) Sunset provision. This section shall expire on September 30, 1994.
   Due to the Effect on Pending Cases Prohibition clause and the fact that the statute is limited in duration, the court will issue its opinion without regard to these provisions.

2. The existence of interstate commerce is both a jurisdictional requirement and an element of the substantive offense. *Cardio–Medical Assoc., Ltd. v. Crozer–Chester Medical Center*, 721 F.2d 68, 71 (3d Cir.1983). MIT concedes that the activities challenged in this case are sufficiently interstate in nature. MIT sends brochures and applications to prospective students in every state and admits many non-Massachusetts residents. In addition, MIT receives charitable contributions from individuals and corporations from around the country. Accordingly, the court will not address this issue.

vated, and was revenue neutral. MIT portrays Overlap's function as the "charitable" component of higher education, which was geared to advancing educational access and socio-economic diversity and maximizing the effective use of privately donated funds. MIT contends that Congress did not intend to subject the charitable functions of nonprofit entities to the proscriptions of the Sherman Act.[3]

MIT relies heavily on *Marjorie Webster Junior College v. Middle States Ass'n of Colleges and Secondary Schools*, 432 F.2d 650 (D.C.Cir.1970). The Middle States Association of Colleges and Secondary Schools, Inc. ("Middle States") is a nonprofit educational corporation which promotes quality in secondary schools and institutions of higher education in a particular geographical area. Chief among its functions is that of accrediting member institutions and those applying for membership. In 1966, Marjorie Webster Junior College, Inc., a proprietary junior college for women located in Washington, D.C., applied for membership with Middle States. Middle States refused the application because Marjorie Webster was not "a nonprofit organization with a governing board representing the public interest." Marjorie Webster brought suit to compel Middle States to consider its application for membership without regard to its proprietary character.

The District of Columbia Circuit Court of Appeals held that the activities of Middle States were non-commercial in nature and, as such, did not fall within the ambit of the Sherman Act. The court stated:

[T]he proscriptions of the Sherman Act were "tailored * * * for the business world," not for the non-commercial aspects of the liberal arts and the learned professions. In these contexts, an incidental restraint on trade, absent an intent or purpose to affect the commercial aspects of the profession, is not sufficient to warrant application of the antitrust laws.

432 F.2d at 654 (footnotes omitted). The court went on to note the historical reluctance of Congress to exercise control in educational matters but added this disclaimer:

We need not suggest this reluctance [to control educational matters] is of such depth as to immunize any conceivable activity of appellant from regulation under the antitrust laws. It is possible to conceive of restrictions on eligibility for accreditation that could have little other than a commercial motive; and as such, antitrust policy would presumably be applied. Absent such motives, however, the process of accreditation is an activity distinct from the sphere of commerce; it goes rather to the heart of the concept of education itself.

432 F.2d at 654–55. This passage insinuates that the Sherman Act does not encompass restraints which operate in traditionally non-commercial domains, irrespective of their effects, unless the restraints were commercially motivated.[4] The Supreme Court rejected this "motivation" requirement and casted doubt on the breadth of *Marjorie Webster* in *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975).

In *Goldfarb*, the Court rejected defendant's attempt to carve out a learned profession exemption from the Sherman Act and held that a minimum fee schedule published by a county bar association and enforced by the Virginia State Bar violated § 1. The Court stated that "[t]he nature of an occupation, standing alone, does not provide sanctuary from the Sherman Act ... nor is the public-service aspect of professional practice controlling in determining whether § 1 includes professions." 421

---

**3.** MIT's status as a nonprofit corporation, on its own, does not shield its conduct from the Sherman Act. *See American Soc'y of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 577, 102 S.Ct. 1935, 1948, 72 L.Ed.2d 330 (1982) ("[I]t is beyond debate that nonprofit organizations can be held liable under the antitrust laws.").

**4.** Presumably, however, under *Marjorie Webster,* once a court finds that such a restraint was commercially motivated, the court would examine the restraint's reasonableness and effects, irrespective of motivation. *See Association for Intercollegiate Athletics for Women v. National Collegiate Athletic Ass'n,* 735 F.2d 577, 583 n. 6 (D.C.Cir.1984).

U.S. at 787, 95 S.Ct. at 2013. The Court explained that in drafting the Sherman Act, Congress intended to strike as broadly as it could. Thus, to recognize exceptions for entire categories of professions would conflict with Congress' intent.[5] Since *Goldfarb*, the Supreme Court has continually brought within the purview of the Sherman Act restraints involving traditionally "non-business" areas. *See F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) (dental association's rules prohibiting members from submitting x-rays with claims forms); *National Collegiate Athletic Ass'n v. Board of Regents of the Univ. of Oklahoma*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) (college athletic association's plan for televising college football games); *Hydrolevel, supra* (nonprofit trade association's promulgation of engineering standards); *National Soc. of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978) (engineer society's canon of ethics prohibiting members from submitting competitive bids).

The court fails to see why the rationale of *Goldfarb* and its progeny with respect to learned professions should not apply with equal force to the field of education. The court does not mean to suggest that aspects of education which could have no conceivable commercial impact or effect would be subject to antitrust scrutiny. On the other hand, the court cannot ignore *Goldfarb's* admonition that profession-wide exemptions should be granted warily. Until the Supreme Court or Congress declare otherwise, the court will adhere to the rule that when an activity is commercial in nature, it falls under the aegis of the Sherman Act, regardless of the setting in which it takes place.

That MIT is a significant commercial entity is beyond peradventure. The magnitude of MIT's economic activity is certainly far greater than that of the vast majority of businesses. MIT has an operating budget of approximately $1.1 billion and an endowment of $1.5 billion. MIT's annual revenues from tuition, room and board charges are approximately $200 million.

MIT provides educational services to its students, for which they pay significant sums of money. The exchange of money for services is " 'commerce' in the most common usage of that word." *Goldfarb*, 421 U.S. at 787–88, 95 S.Ct. at 2013. By agreeing upon aid applicants' families' expected financial contribution, the Ivy Overlap Group schools were setting the price aid applicants and their families would pay for educational services. The court can conceive of few aspects of higher education that are more commercial than the price charged to students.

MIT's attempt to disassociate the Overlap process from the commercial aspects of higher education is pure sophistry. Although MIT characterizes its financial aid as "charity," in essence, MIT provides a "discount" off the price of college offered to financial aid recipients. Further, accepting for the moment MIT's assertion that the impetus for instituting Overlap was to distribute more fairly limited financial resources for student aid, the means chosen to effectuate this goal, the elimination of merit scholarships and ensuring that commonly admitted aid recipients would pay the same regardless of which institution they decided to attend, is unquestionably commercial in nature. Not only did the effects of Overlap fall within the "sphere of commerce," but its existence struck at the heart of the commercial relationship between school and student.

## PER SE v. RULE OF REASON

■ The language of the Sherman Act, taken literally, encompasses every conceivable contract or combination which affects commerce and is in restraint of trade. *Arizona v. Maricopa County Medical Soc.*, 457 U.S. 332, 342–43, 102 S.Ct. 2466, 2472, 73 L.Ed.2d 48 (1982). *See also Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918) ("Every agreement concerning trade,

---

**5.** The Court did specify, however, that distinctions between businesses and professions are meaningful in other contexts, particularly when evaluating whether a particular restraint is lawful. *See* discussion of *Goldfarb, infra.*

every regulation of trade, restrains. To bind, to restrain, is of their very essence"); *United States v. Topco Assocs. Inc.*, 405 U.S. 596, 606, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972) ("Were § 1 to be read in the narrowest possible way, any commercial contract could be deemed to violate it."). The Supreme Court recognized that Congress could not have intended a literal interpretation of the Act and concluded, drawing on its legislative history, that only restraints which are "unreasonable" are unlawful. *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Most types of restraints are judged by the so-called "Rule of Reason." There are certain types of restraints, however, which are by their nature so plainly anticompetitive and are so lacking in redeeming virtue that they will be declared *per se* unreasonable and conclusively presumed illegal without any further analysis. *Broadcast Music Inc. v. Columbia Broadcasting Sys., Inc.*, 441 U.S. 1, 8, 99 S.Ct. 1551, 1556, 60 L.Ed.2d 1 (1979); *National Soc. of Professional Engineers v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978); *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 50, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977); *Northern Pacific. Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). In *Northern Pacific*, the Court explained the rationale behind the *per se* rules:

> This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken.

356 U.S. at 5, 78 S.Ct. at 518.

Horizontal agreements to fix prices have traditionally been subject to the *per se* rule. In *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 218–223, 60 S.Ct. 811, 842–44, 84 L.Ed. 1129 (1940), the Supreme Court reiterated the rule which is still in full force today:

> [F]or over forty years this Court has consistently and without deviation adhered to the principle that price-fixing agreements are unlawful per se under the Sherman Act....

\* \* \* \* \* \*

> Any combination which tampers with price structures is engaged in an unlawful activity. Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces. The Act places all such schemes beyond the pale and protects any degree of interference. Congress has not left with us the determination of whether or not particular price-fixing schemes are wise or unwise, healthy or destructive.

Other types of restraints which the Supreme Court has declared as *per se* unreasonable include tying arrangements, *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), vertical price fixing agreements, *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), horizontal territory restrictions, *Topco Associates, supra,* and certain group boycotts, *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Klor's, Inc. v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).

Merely because a certain practice bears a label which falls within the categories of restraints declared to be *per se* unreasonable does not mean a court must reflexively condemn that practice to *per se* treatment. In *Broadcast Music*, the Supreme Court refused to apply the *per se* rule to a system whereby licensing agencies for composers, writers and publishers received fees for the issuance of blanket licenses to

perform copyrighted musical compositions.[6] The Court reasoned that not every agreement which may be characterized as price fixing in the literal sense is the type of restraint to which the *per se* rule is meant to apply. The Court stated:

> As generally used in the antitrust field, "price fixing" is a shorthand way of describing certain categories of business behavior to which the *per se* rule has been held applicable. The Court of Appeal's literal approach does not alone establish that this particular practice is one of those types or that it is "plainly anticompetitive" and very likely without "redeeming virtue." Literalness is overly simplistic and often overbroad. When two partners set the price of their goods or services they are literally "price fixing," but they are not *per se* in violation of the Sherman Act.... Thus, it is necessary to characterize the challenged conduct as falling within or without that category of behavior to which we apply the label *"per se* price fixing." That will often, but not always, be a simple matter.

441 U.S. at 10, 99 S.Ct. at 1557 (citations omitted). *See e.g. National Collegiate Athletic Ass'n v. Board of Regents of the Univ. of Oklahoma,* 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) (inappropriate to apply *per se* rule because horizontal restraints on competition are essential if product is to be available at all).

In *Goldfarb,* the Supreme Court cautioned against applying rigid, inflexible rules to restraints which occupy "non-business" settings. The Court characterized as price fixing a state bar minimum fee schedule for legal services but nonetheless scrutinized the practice under the Rule of Reason. In what since has become a widely discussed footnote, the Court remarked:

> The fact that a restraint operates upon a profession as distinguished from a business is, of course, relevant in determining whether that particular restraint violates the Sherman Act. It would be un-

realistic to view the practice of professions as interchangeable with other business activities, and automatically to apply to the professions antitrust concepts which originated in other areas. The public service aspect, and other features of the professions, may require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context, be treated differently.

421 U.S. at 788 n. 17; 95 S.Ct. at 2013. *See also Professional Engineers, supra.*

As the above cited footnote from *Goldfarb* and later Supreme Court holdings make clear, courts should extend hesitantly the reaches of the *per se* rule to non-business contexts so that at least some attempt is made to see whether the way in which the restraint acts upon a profession's particular characteristics has economic effects which would warrant special consideration under the Sherman Act.

In *Arizona v. Maricopa County Medical Soc.,* 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982), the Court applied the *per se* rule in invalidating a maximum fee schedule for medical services. Nevertheless, the Court signaled that it was not retreating from the rationale of *Goldfarb:*

> The price-fixing agreements in this case, however, are not premised on public service or ethical norms. The respondents do not argue, as did the defendants in *Goldfarb* and *Professional Engineers,* that the quality of the professional service that their members provide is enhanced by the price restraints.

*Id.,* 457 at 349, 102 S.Ct. at 2475. The Court stressed that *per se* invalidation was proper since the effects of the maximum price schedule did not distinguish the medical profession from any other provider of goods and services. The policy of applying reluctantly *per se* rules to the learned professions was reaffirmed just a few years later. In *FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 106 S.Ct. 2009, 90

---

**6.** The court held that the establishment of a price for the blanket licenses was an incidental, albeit necessary, consequence of the creation of the licenses themselves. Further, the licensing system did not place any restraints on the ability of copyright owners to sell their compositions.

L.Ed.2d 445 (1986), the Federal Trade Commission challenged a dental association regulation which forbid members to submit x-rays to dental insurers in conjunction with claims requests. The Court declined to apply the *per se* rule on the basis that:

> [W]e have been slow to condemn rules adopted by professional associations as unreasonable *per se* ... and, in general, to extend *per se* analysis to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious.

*Id.,* 476 U.S. at 459–460, 106 S.Ct. at 2018 (citations omitted).

The court's decision to apply the Rule of Reason does not stem from a reluctance to characterize the Ivy Overlap process as the type of price fixing which is ordinarily *per se* unreasonable.[7] These activities amount to more than price fixing in the literal sense. The Ivy Overlap Group members, which are horizontal competitors, agreed upon the price which aid applicants and their families would have to pay to attend a member institution to which that student had been accepted. Further, the Ivy Overlap Group's agreed-upon ban on merit scholarships foreclosed the possibility that non-aid applicants could receive a discount based on any type of meritorious achievement. *See Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643, 648, 100 S.Ct. 1925, 1928, 64 L.Ed.2d 580 (1980) ("[A]n agreement to eliminate discounts ... falls squarely within the traditional *per se* rules against price fixing."). Nevertheless, in the exercise of caution and in light of the Supreme Court's repeated counsel against presumptive invalidation of restraints involving professional associations, the court will scrutinize the Ivy Overlap Group under the Rule of Reason.

## RULE OF REASON

■ Application of the Rule of Reason has changed very little since Justice Brandeis' explanation in *Chicago Bd. of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918):

> The true test of legality is whether the restraint is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.

In *National Soc. of Professional Engineers v. United States,* 435 U.S. 679, 689, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978), however, the Court emphasized that the Rule of Reason "does not open the field of antitrust inquiry to any argument in favor of a challenged restraint that may fall within the realm of reason." The proper inquiry is limited to whether the restraint in question "is one that promotes competition or one that suppresses competition." *Id.,* 435 U.S. at 692, 98 S.Ct. at 1365.

The evidence adduced at trial clearly established that the awarding of financial incentives in the form of aid by institutions of higher education is a traditional feature of student recruitment. The evidence also established that the receipt of financial incentives in the form of aid weighs heavily in a student's and his or her family's decision-making process with respect to which

---

**7.** The court's refusal to adopt a *per se* approach is not based, as MIT urges, upon the lack of experience among courts with regard to Overlap agreements. *See Topco Associates,* 405 U.S. at 607–08, 92 S.Ct. at 1133 ("It is only after considerable experience with certain business relationships that courts classify them as *per se* violations of the Sherman Act"). As the Supreme Court commented in *Maricopa,* 457 U.S. at 349

n. 19, 102 S.Ct. at 2475, this argument confuses "the established position that a *new per se* rule is not justified until the judiciary obtains considerable rule-of-reason experience with the <u>particular type of restraint challenged.</u>" (italics in original; underline added). The challenged conduct in the present case involves price fixing, which is hardly a new type of restraint.

school to attend.[8] No reasonable person could conclude that the Ivy Overlap Agreements did not suppress competition. As a result of the Ivy Overlap Agreements, the member schools created a horizontal restraint which interfered with the natural functioning of the marketplace by eliminating students' ability to consider price differences when choosing a school and by depriving students of the ability to receive financial incentives which competition between those schools may have generated. Indeed, the member institutions formed the Ivy Overlap Group for the very purpose of eliminating economic competition for students. One need look no further than the language of the Agreements themselves, which directly proclaimed the intent to neutralize the effect of financial aid so that a student may choose among Ivy Group institutions for reasons other than cost.

In addition to the express commands of the Ivy Overlap Agreements, there was abundant and uncontroverted evidence that the fundamental objective of the Ivy Overlap Group was to eliminate price competition among the member institutions. Pursuant to this end, the schools devised a common methodology of needs analysis, exchanged prospective self-help tuition and other budgetary information, agreed not to award merit scholarships and compared and adjusted proposed family contributions at annual Spring Meetings. Each of these elements served to ensure that families would pay approximately the same amount regardless of the Ivy Group institution the student chose to attend. Consequently, since the school would not compete financially for students, the awarding of aid was unresponsive to the demands of students and their families. These agreements were enforced, cheating was rare, and the schools even attempted to recruit Stanford, the only other school which provided any meaningful competition for the same student base, to participate in the process.

The actual economic repercussions of the Ivy Overlap Agreements was the subject of much focus at trial. The government and MIT attempted to demonstrate, both empirically and theoretically, the effect that Overlap had on the price of education at the Ivy Overlap Group schools.[9] Whether or

---

8. An educational counselor for MIT succinctly explained the relationship between costs and the college selection process:

> [Students] are always concerned about money. They are always concerned about money. They are typically concerned less about whether the curriculum is right for them or not. That's sort of a second tier kind of a thinking, people don't get to that while they are applying a lot of times.

(N.T. 1515).

9. MIT contends that while economic theory can predict the behavior of a for-profit firm, since by definition its primary motivation is profit-maximization, economic theory cannot predict the consequences of cooperative behavior among non-profit institutions such as colleges, since non-profit educational institutions have diverse interests, some of which may conflict with the goal of profit-maximization. MIT contends that basic economic theory rejects a presumption that bona fide non-profit organizations that act cooperatively will do so in a way that harms the consumer.

The government's expert economist, on the other hand, testified that institutions of higher education are motivated to collude, just as profit-maximizers are. According to the government's economist, colleges compete for many things such as students, faculty, and financial support. By minimizing the competition for students, the schools can increase their revenue as compared to costs. Since these institutions do not distribute profit among owners, the decision-makers can consume these increases in other ways, such as greater travel funds, higher faculty salaries, improved facilities, etc. According to the government's economist, the only distinction between for-profit and non-profit entities is the way in which they consume profit—for-profit entities distribute profits among the owners, while non-profit entities distribute profits within the organization. This distinction, concludes the government's expert, has no significance economically.

Both the government and MIT set out to substantiate their theories and demonstrate empirically what each believed to be the proper relationship between Ivy Overlap Agreements and the price of an Overlap institution education, or, phrased differently, whether the price for an education rose as a result of Overlap. Both experts agreed that price is properly defined as average net revenue per student, but the similarity in approaches ended there. The government's economist chose to compare the average net revenue per student of the Ivy Overlap Group schools with the average net revenue per student of several different schools which he deemed to be comparable. MIT's expert conducted a multiple regression analysis, a method which permits an economist to isolate a single variable in a multiple-variable environment. Only by controlling for numerous factors which

not Overlap increased or decreased net revenues, to the extent it is even capable of being proved with a reasonable degree of economic certainty, is, nevertheless, not germane to the resolution of this case, nor is the array of studies and comparisons the government submitted purporting to demonstrate other tangible anticompetitive effects of Overlap.[10] The economists' theoretical models and empirical analyses, while quite interesting, do no more than distract the court from the inescapable truth that by entering into the Ivy Overlap Agreements, the member institutions purposefully removed, by agreement, price considerations and price competition for an Overlap school education.

The Rule of Reason ordinarily requires an in-depth inquiry into the actual market impact of a restraint. There are some agreements, however, that are so inherently suspect, that even under the Rule of Reason "no elaborate industry analysis is required to demonstrate [their] anticompetitive character." *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459, 106 S.Ct. 2009, 2018, 90 L.Ed.2d 445 (1986); *Professional Engineers*, 435 U.S. at 692, 98 S.Ct. at 1366. This is such an agreement. By agreeing among themselves not to offer merit scholarships, the Ivy Overlap schools in effect agreed not to compete for students by using competitive discounts based on merit, which deprived students, needy or not, of the opportunity to receive competi-

could have an effect on net price, according to MIT's economist, is it possible to gauge accurately Overlap's effect on net price. To that end, his study compared over 220 institutions with available data. Not surprisingly, each economist arrived at very different conclusions. The government's comparisons showed that the average net revenue per student for the Ivy Overlap schools was generally higher than the average net revenue per student for other comparable schools. The difference, according to the government's expert, was economically significant and demonstrated that the Overlap process had an effect of raising the average net revenues of the Ivy Overlap Group schools. MIT's regression analysis, on the other hand, revealed no demonstrable statistical effect of Overlap on average net price per student. MIT's expert concluded, as a result, that the Ivy Overlap schools did not take in more revenue as a result of Overlap, as it would have in Overlap's absence.

**10.** The government presented an array of studies and comparisons purporting to demonstrate tangible anticompetitive effects of Overlap. The government points out that the Ivy Needs Methodology taxes a larger amount of income and assets for the family contribution determination than does the Congressional Methodology. The effect of this, according to the government's economist, is that the agreed-upon financial contributions was greater than it would have been had the Ivy Needs Methodology not been employed. The government also presented comparisons showing that the needy and minorities, the two groups MIT asserts are the direct beneficiaries of Overlap, had higher family contributions as a result of Overlap as well.

Further, the government demonstrated how the Spring Meeting negatively affected the economic opportunities available to students. The government's economist examined the bilateral rosters that MIT had with each of the Ivy League schools for 1988, paying special attention to handwritten changes that were made to the family contribution figures at the Spring Meeting, to the extent the changes were decipherable. He then compared the average family contribution of all the schools before changes were made with the average family contribution of all schools after changes were made. This comparison revealed that the changes made at the bilateral meeting did not result in a economically significant increase to the schools' average family contribution. This did not mean that there was not a significant impact on the price paid by students and their families, however. To demonstrate, the government's economist posed the following hypothetical: Before the Spring Meeting, student x had a family contribution, as calculated by MIT, of $2,000, and a family contribution, as calculated by Harvard, of $6,000. At the bilateral meeting, MIT and Harvard met in the middle and agreed that student x's family contribution would be $4,000. This would obviously mean that MIT's family contribution is up, Harvard's is down, and as to the average for the two schools, there has been no change. From the perspective of student x and his or her family, however, their "best financial opportunity" has increased by $2,000. The government's economist defined "best financial opportunity" as the difference between the lowest price that family faced before the reconciliation and that which it faced after the reconciliation. He found that on average, the "best financial opportunity" for those students whose family contribution was changed at the 1988 bilateral meetings increased by $1,091, a figure which he deemed to be economically significant.

MIT assailed the accuracy of the government's data and challenged the significance of the conclusions that the government sought the court to draw from this evidence. Much of MIT's criticism was sound.

tive tuition reductions. By ensuring that students and their families would pay the same amount regardless of which Ivy Overlap Group institution the student decided to attend, whether it was a result of the common-needs analysis formula or by actual discussions at the Spring Meeting or the post-Overlap process, the Ivy Overlap Agreements denied students the ability to compare prices when choosing among the Ivy Overlap Group institutions. A market which is unresponsive to consumer preference infringes upon the most fundamental principle of antitrust law. In fact, MIT's defense, that competition for students would lead to the erosion of need-blind admissions and need-based aid, "confirms, rather than refutes the anticompetitive purpose and effect of its agreement." *Professional Engineers*, 435 U.S. at 693, 98 S.Ct. at 1366.

No showing that Overlap did not result in more profits for the colluding schools can camouflage its effect on competition. To suggest otherwise would be to greatly misperceive the ills which the Sherman Act was intended to cure. The Sherman Act presumes that any tampering with the free forces of the market is detrimental. Consequently, any agreement that interferes with the setting of price in the free market "is illegal on its face." *Id.*, 435 U.S. at 692, 98 S.Ct. at 1365. MIT may argue that competition was not harmed because the Ivy Overlap process did not raise price, but as far as the Sherman Act is concerned, when competition is eliminated, competition is harmed. As the Supreme Court stated in *Indiana Federation of Dentists:*

> A refusal to compete with respect to the package of services offered to customers, no less than a refusal to compete with respect to the price term of an agreement, impairs the ability of the market to advance social welfare by ensuring the provision of desired goods and services to consumers at a price approximating the marginal cost of providing them. Absent some countervailing procompetitive virtue—such as, for example, the creation of efficiencies in the operation of a market or the provision of goods and services ... such an agree-

ment limiting consumer choice by impeding the "ordinary give and take of the market place," ... cannot be sustained under the Rule of Reason.

476 U.S. at 459, 106 S.Ct. at 2018 (citations omitted).

Since the Ivy Overlap Agreements are plainly anticompetitive, the Rule of Reason places upon MIT "a heavy burden of establishing an affirmative defense which competitively justifies this apparent deviation from the operations of a free market." *National Collegiate Athletic Ass'n v. Board of Regents of the Univ. of Oklahoma,* 468 U.S. 85, 113, 104 S.Ct. 2948, 2966, 82 L.Ed.2d 70 (1984). Even accepting MIT's premise that Overlap was revenue neutral, to say that a restraint is revenue neutral, by itself, says nothing of its procompetitive virtue.

MIT offers the following justifications. MIT contends that Overlap actually enhanced competition in that it provided opportunities for needy students who otherwise would not have been able to attend the Ivy Overlap Group institutions, without limiting the choices available to non-needy students who did not require financial assistance. MIT also professes that Overlap enhanced competition among students for limited enrollment opportunities and competition among the member schools in areas such as the curriculum, campus life, vocational opportunities and reputation. MIT's principal defense is that only by coordinating several aspects of their financial aid programs are the Ivy Overlap Group schools able to assure that students are admitted only on the basis of merit and that the full financial need of admitted students is met. According to MIT, the Ivy Overlap Group schools' administrators and financial aid officers are under constant pressure from faculty, alumni and others to enroll the most qualified student body possible. MIT insists that without Overlap's obligations and disciplines, the member institutions will presumably, one by one, succumb to these pressures to attract the most desirable students, and, eventually, engage in a bidding war for the "best of the brightest" by offering merit scholar-

ships and increased grant awards. As a consequence, the schools will find it necessary to shift "limited" financial aid resources to highly qualified but non-needy students, which in turn will significantly decrease the availability of need-based aid. MIT, echoing the sentiments of other Ivy Overlap Group institutions, explained that it "could not idly sit by and watch significant numbers of the best and brightest students attend other institutions due to large scholarship awards ... [F]aced with this situation, MIT would be forced to respond." MIT's Post–Trial Memorandum at 38.

The effects of the elimination of need-blind admissions and need-based aid, according to MIT, would be devastating. It would undermine efforts to maintain educational access and opportunity and impede socio-economic diversity, which would lessen the overall quality of education. These policies, according to MIT, have dramatically changed the character of American education:

> These programs have enabled large numbers of needy students to obtain a high quality college education despite their inability to pay for it. Minority groups, which are disproportionately represented among the class of high need students, have experienced greatly improved educational access. Providing educational opportunity to these students benefits the individual student by providing him or her with the skills to compete and succeed in the labor market, benefits society by increasing the education level of its members and enhancing the ranks of productive, tax-paying citizens, and provides hope to similarly situated students who see their predecessors succeed. It also improves the educational experience of classmates of needy students, who are exposed to a greater diversity of viewpoints and ideas.

MIT's Post–Trial Memorandum at 5.

The issue before the court is not, as MIT suggests, whether the Sherman Act permits institutions of higher education to maintain the policies of need-blind admissions and need-based aid. Every institution, with or without Overlap, is free to embrace independently any admission and financial aid policy it wishes, and most do. The court is not to decide whether social policy aims can ever justify an otherwise competitively unreasonable restraint. The issue before the court is narrow, straightforward and unvarnished. It is whether, under the Rule of Reason, the elimination of competition itself can be justified by non-economic designs. The Supreme Court has unambiguously and conclusively held that it may not.

In *Professional Engineers,* the Supreme Court nullified an engineering association's canon of ethics prohibiting its members from engaging in competitive bidding for engineering services. The association contended that the ban on competition was justified because without it, engineers would be pressured to design and manufacture structures and offer other engineering services at the lowest possible price, which would lead to inferior work and, in turn, pose a danger to public safety, health and welfare. The Supreme Court stated that it has never accepted such an argument. Whatever the risk that competition may lead to inferior engineering services, the basic policy underlying the Sherman Act "precludes inquiry into the question whether competition is good or bad." *Professional Engineers,* 435 U.S. at 695, 98 S.Ct. at 1367. The court stated that:

> Petitioner's ban on competitive bidding prevents all customers from making price comparisons in the initial selection of an engineer, and imposes the Society's views of the costs and benefits of competition on the entire marketplace. It is this restraint that must be justified under the Rule of Reason, and Petitioner's attempt to do so on the basis of the potential threat that competition poses to the public safety and the ethics of its profession is nothing more than a frontal assault on the basic policy of the Sherman Act.

*Id.,* 435 U.S. at 695, 98 S.Ct. at 1367.

The Supreme Court reaffirmed these principles in *Indiana Federation of Dentists,* wherein an association of dentists

challenged a Federal Trade Commission determination that a conspiracy among Indiana dentists to refuse to comply with requests by dental insurers to submit x-rays for use claims determinations was an unreasonable restraint of trade in violation of § 1 of the Sherman Act and, consequently violated § 5 of the Federal Trade Communications Act. The dental insurers requested the x-rays pursuant to newly developed "alternative benefits plans," which were cost containment measures requiring insurers to evaluate dentists' diagnoses and recommendations so as to ensure that dentists provide the patient with the "least expensive yet adequate treatment." Among the association's defenses which the Supreme Court rejected was the so-called "quality of care defense." The dentists argued that x-rays, in and of themselves, are not sufficient bases for diagnosis and treatment determination. They added that if insurers ground their claims decisions solely on an examination of x-rays to the exclusion of other diagnostic aids available to dentists, then the risk exists that insurers may improperly refuse to pay for treatment that is in the best interest of the patient. In dismissing such justifications, the Court again characterized as an affront to the Sherman Act the belief that in an unrestrained market wherein consumers are given access to information they believe is relevant to their choices, consumers will be led into making unwise and dangerous choices. The Court stated:

> The premise of the argument is that, far from having no effect on the cost of dental services chosen by patients and their insurers, the provision of x-rays will have too great an impact: it will lead to the reduction of costs through the selection of inadequate treatment. Precisely such a justification for withholding information from customers was rejected as illegitimate in [*Professional Engineers*].

*FTC*, 476 U.S. at 463, 106 S.Ct. at 2020.

MIT's defense is indistinguishable from the defenses offered in *Professional Engineers* and *Indiana Federation of Dentists*. The Ivy Overlap Group believes that only by eliminating competition is it able to ensure that scarce financial resources are allocated in a manner which it deems to be most advantageous. In so doing, the Ivy Overlap Group was simply imposing its view of the costs and benefits of competition on the marketplace for an education at the elite institutions of higher education.

The ways in which our nation profits when our many great institutions of higher education open their doors to those who for too long were denied the privilege of attending college are immeasurable. These policies send an important signal to a large segment of our society that persons need not presume they are unable to attend college for fear of not being able to afford what has become the extraordinary cost of higher education. Nor can it be denied, as the testimony of several witnesses attested, that cultural and economic diversity contributes to the quality of education and enhances the vitality of campus life. What can be questioned, however, is whether the scheme whereby the Ivy Overlap Group schools conspire to remove price as a facet of competition for students is a necessary ingredient to achieve these ends.

The court is unconvinced because there is no evidence supporting MIT's fatalistic prediction that the end of the Ivy Overlap Group necessarily would sound the death knell of need-blind admissions or need-based aid. MIT has relentlessly emphasized, at each stage of this case, the benefits fostered by the policies of need-blind admissions and need-based aid. Almost every witness testifying on MIT's behalf spoke of how the institutions themselves benefitted from a culturally and economically diverse student body. Yet, the message to be gleaned from MIT's defense is that the moment the Ivy Overlap Group schools are no longer able to jointly eliminate price competition, they will immediately bow to faculty pressure to enroll the very highest caliber student at high cost and at the expense of needy students, leaving behind hallowed principles of equality of educational access and opportunity and the resultant societal benefits which they have so ardently underscored. William Bowen, past President of Princeton Univer-

sity, believes that if Overlap ends, the member schools will take "one step back toward the economic segregation of higher education." Can the Ivy Overlap Group members' purposes be so fragile that their primary goal of having the most desirable students outweighs their ability, without Overlap, to pursue diligently even an imperfect policy of promoting the virtue of student diversity and the advantages of making available to needy students the benefits of these elite educational institutions? Will there also be lost the value to be gained by signaling to all prospective students that they can in fact aspire to attend an Ivy Overlap Group institution even though their families may be of limited means? The court thinks not. If MIT and the other Ivy League schools were to so easily abandon these objectives merely because Overlap was not in play, then the court could only conclude that their professed dedication to these ends was less than sincere.

By the same token, if these policies are as meaningful as MIT avows, and these institutions refuse in any way to forsake admitting the "best of the best," then they should be willing to dedicate the necessary resources to ensure the continuation of these policies. It is certainly true that these decisions, like nearly every important decision these schools must make, will be difficult and will have a financial impact in other areas of the schools' operations. The end of Overlap will only portend the end of need-blind admissions and schools' ability to guarantee the full need of their aid applicants if the schools decide that other financial priorities occupy a higher investment and financial plane. The dilemma over resource allocation always triggers budgetary balancing, and that is likely to be called for here. Such balancing is not new, nor is it unreasonable, if the suggested method of avoiding it is to act contrary to the law.

Lastly, MIT urges the court to assess the Ivy Overlap Group against the background of our national education policy, the cornerstone of which, for several decades, has been the advancement of equality of educational access and opportunity. The al-lure of approaching this case in such a posture is evident. The court, is obligated, however, to judge Overlap against a different framework: that of the Sherman Act, which, though not as old as MIT, has nevertheless for more than a century guided our Nation's economic policies. MIT insists that Overlap must be sustained because "leaving educational opportunity to the vagaries of the commercial marketplace would hurt society and be unfair to individuals." MIT's Post–Trial Memorandum at 2. Congress, in passing the Sherman Act, made a very different value judgment, that far from hurting society and the individual, an unrestrained and unencumbered marketplace is their best protector:

> The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions.

*Northern Pacific Ry Co. v. United States,* 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545 (1958). Congress is certainly free to decide that our national education policy could be better served by Overlap than by the operation of an unfettered marketplace. Until Congress declares otherwise, however, the court has no choice but to respect 102 years of our nation's antitrust policy.